Charles W. Tarbell, Appellant, v. The Royal Exchange Shipping Company (Limited), Respondent.

While the obligation of a common-carrier by water is, not only to carry the goods to the port of destination, but to deliver them there to the consignee, and so does not, *ipso facto*, cease on the unloading of the goods from the ship and their deposit upon a wharf, when the place of discharge is the terminus of the particular voyage, a delivery which will discharge the carrier, may be constructive, not actual.

To constitute a constructive delivery the carrier must, if practicable, give notice to the consignee, and, when this has been done, and the goods are discharged in the usual and proper place, and reasonable opportunity afforded to the consignee to remove them, the liability of the carrier, as such, terminates.

The general duty of such a carrier to deliver, and of a consignee to receive, is not essentially changed by a clause in the bill of lading providing that the goods are to be delivered "from the ship's deck, when the shipowner's liability shall cease," or by a clause that the goods are to be received "immediately the vessel is ready to discharge."

A carrier's whole duty is not, however, discharged in all cases by a constructive delivery which terminates his strict responsibility as carrier. Although the consignee may neglect to accept or receive the goods, the carrier is not justified in abandoning them, or in negligently exposing them to injury. So long as he has the custody, although there has been a constructive delivery, it is his duty, as bailee or warehouseman, to take ordinary care of them.

A quantity of tin was shipped in India on board defendant's steamship, under a bill of lading, stipulating that the tin should be transported to London and thence by steamer to New York. The steamer having the consignment of tin on board arrived at her wharf in New York harbor on Saturday, and notice was on the same day given to the consignees. The goods were discharged from the ship on Monday and deposited on the proper wharf. After the consignees had had three full days to remove the tin, it was discovered that part of it had been removed from the wharf by some one without authority from the consignees. In an action to recover for the loss, *held*, that as said loss occurred after the lapse of a reasonable time for the removal of the tin by the consignees after notice, defendant was not liable as a common-carrier.

It appeared that the wharf was closed by a gate through which the missing tin must have been taken; that the delivery to consignees of cargo landed at defendant's wharf was under the direction of a delivery clerk, who had been instructed not to deliver goods to be taken from the wharf without taking a receipt, and that it was the practice of the gateman, when goods were being removed by a cartman, to count the load

and take the cartman's receipt in a book provided for that purpose. The delivery clerk testified that when he knew the cartmen, he sometimes permitted them to take goods without receipting for them. There were no receipts taken for the tin in question. The balance of the consignment, which was delivered on orders of the consignees, was receipted for. *Held*, that the servants of defendant were negligent in omitting to take ordinary care in the custody of the tin in question, permitting it to be removed without taking receipts; that defendant was chargeable with such negligence, and so was liable for the loss.

Also, *held*, that although the complaint was based solely on the contract of affreightment, as the case was tried upon both theories of liability without objection, it was too late to take the objection here.

*Tarbell* v. *Royal Exchange Shipping Company* (21 J & S. 190) reversed

(Argued June 6, 1888; decided June 29, 1888.)

APPEAL from order of the General Term of the Superior Court of the city of New York, made May 11, 1886, which reversed a judgment in favor of plaintiff, entered upon a decision of the court on trial without a jury. (Reported below, 21 J. & S. 190.)

This action was brought to recover damages for the non-delivery in New York of sixty-three slabs of tin, part of a shipment of 1,702 slabs, made at Singapore, India, September 7, 1882, under a bill of lading stipulating that the tin should be transported from Singapore to London, per the steamer "Thibet," and thence by a steamer of the Monarch line to New York.

The "York City," having the consignment of tin on board, arrived at her wharf in Jersey City, on Saturday, September 25, 1882. On the same day notice was given by the agents of the defendant to Mayer Bros. & Co., the assignees, of the bill of lading, of the arrival of the vessel, and on that day Mayer Bros. & Co. entered the tin at the custom-house, and there being no duty on tin, obtained a free permit for its discharge. On Monday, the twenty-seventh, the consignees paid the freight to the ship's agents, who thereupon gave to Mayer Bros. & Co. a delivery order addressed to the delivery clerk of the Monarch line at Pavonia ferry, Jersey City, for the delivery of the tin. Mayer Bros. & Co. presented to and

left with the delivery clerk, on the same day, the custom-house permit and the delivery order, with an indorsement on the latter, "Deliver to our order only." Before the arrival of the vessel Mayer Bros. & Co. had sold to one Peter Hayden, generally, twenty-five tons of tin to arrive, and he had made a similar sale to Lucius Hart & Co. On the afternoon of the same day, Mayer Bros. & Co. sent a weigher to the defendant's wharf to weigh the tin, instructing him to separate it into lots of five tons each, and to mark the lots consecutively, 1, 2, 3, 4, 5, etc. The weigher on reaching the wharf found that the tin had not been discharged from the vessel, but was told by the delivery clerk that it would be discharged right off. He did not wait, but returned to the wharf on the morning of Friday, the twenty-eighth, about eight o'clock, and then found about thirty tons discharged and lying on the wharf. He weighed and divided it into five ton lots, numbered it as instructed, and completed the weighing about eleven o'clock, and about noon of that day sent returns of the weights to Mayer Bros. & Co. About one o'clock of the same day Mayer Bros. & Co., in fulfillment of the contract of sale to Peter Hayden, sent to him an order, in writing, on the delivery clerk of the vessel for the delivery to him of lots 1, 2, 3, 4, 5 of the tin, and with the order sent the weigher's return of the said five lots. Peter Hayden at once indorsed the order to Lucius Hart & Co., his vendees, and between one and three o'clock delivered it, with the weigher's return, to that firm. Lucius Hart & Co. made no effort to take the tin that day. On the morning of September twenty-ninth they sent two trucks, one double and one single-horse truck, to the wharf to take tin. The drivers were accompanied by one James Coughran, an employe of Lucius Hart & Co., who handed to and left with the delivery clerk the order for lots 1, 2, 3, 4, 5. The two-horse truck, before noon, drew two loads of the tin to the store of Lucius Hart & Co. in New York, in all about four tons, and the one-horse truck one load, consisting of about one ton, and no more was drawn on that day. The next day, the thirtieth, was Thanksgiving Day, Lucius Hart & Co. did not send to the wharf at

all on that day, though the wharf was open for business, and other merchants sent for and took away goods on that day. On the morning of December first it was found that the piles of tin included in the order to Lucius Hart & Co., had been disturbed and that sixty-three slabs of tin were missing, but when the sixty-three slabs were taken away or by whom, or under what circumstances is not disclosed.

The trial judge found explicitly that they were not stolen, although there is an apparent inconsistency between this finding and an expression in a finding proposed by the defendant, adopted by the judge, in which, after stating that on the morning of December first investigation showed that sixty-three slabs were missing, the finding concludes: "No clue to the stolen tin was ever obtained."

The trial court found, on the request of the defendant, as follows: "The part of the wharf where the tin lay was the private wharf of the defendant. It was covered with a substantial building, the doors of which were locked at night. Two watchmen were employed by the defendant to watch the wharf by day and four by night, and due care had been taken in their selection. There was also a competent person in the employ of the defendant to keep a tally of the cargo taken away by merchants, and to take receipts for it." It was shown that the delivery of cargo landed on defendant's wharf, to consignees, was under the direction and supervision of the delivery clerk and his subordinates. But the delivery clerk had been instructed by the defendant not to deliver goods to cartmen without taking a receipt, and it was his duty to take receipts for goods before he permitted them to be taken from the wharf. The practice was for the gateman to count the load and take the cartman's receipt in a book provided for that purpose, after the goods were loaded and before the cartman left the pier. Madigan, the delivery clerk, testified that when he knew the cartmen, he sometimes permitted them to take goods without receipting for them. There were no receipts taken for the sixty-three slabs in question. The three loads taken on the twenty-ninth were receipted for according to the

rule, as were also the loads subsequently taken by Lucius Hart & Co., constituting the remainder of the twenty-five tons purchased by them, less the sixty-three slabs, the receipts being in form; "Received in good order from on board the S. S. York City, the following packages for Mayer Bros. & Co.," with a statement of the number of slabs, the date, the number of the cart, and signed by the cartman. After the discovery of the loss of the sixty-three slabs, the defendant, by its agents, made diligent inquiry to ascertain what had become of them, but was wholly unable to trace them. Each slab weighed more than 100 pounds. Due demand for the tin was made of the defendant before suit brought.

The trial judge found that the defendant was negligent in not warehousing the tin, and also that the delivery clerk was negligent in permitting goods to be removed from the dock without taking receipts from the cartmen in every instance, and that his negligence was the negligence of the defendant Judgment was for the plaintiff, for the value of the missing tin, on two grounds, *first*, that it was liable as carrier; and, *second*, if this relation had terminated, it was liable, as a warehouseman, for negligence. The General Term reversed the judgment on the ground that the defendant's responsibility as carrier had terminated by a delivery of the tin to Mayer Bros. & Co. before the loss in question, taking no notice of the other ground of liability on which the judgment also proceeded. Other facts are referred to in the opinion.

*Charles Blandy* for appellants. Defendant's failure to warehouse the tin and to notify the consignees that reasonable time to remove the goods had expired, was negligence for which it is liable. (*Collins* v. *Burns*, 63 N. Y. 1; *Gleadell* v. *Thompson*, 56 id. 194, 197.) It was competent for the defendant to put its own construction upon its duty in respect to taking receipts for goods from consignees. (*Stokes* v. *Recknagel*, 38 Supr. Ct. 368.) Defendant was liable for a loss occurring while the goods were in its possession and control, without regard to the lapse of time. (*Bank of Oswego* v.

*Doyle*, 91 N. Y. 32, 42.)    The failure of defendant to deliver the goods raised a presumption of negligence.    (*Canfield* v. *Baltimore Co.*, 93 N. Y. 532, 538.)    As the reasonable time of the consignee to remove the goods had not expired when the loss was discovered, the defendant was liable as carrier without regard to the question of negligence.    (*McKinney* v. *Jewett*, 90 N. Y. 267, 271.)    The defendant having received the tin as a carrier, it became its duty to deliver it to the proper party, and this duty was equal to its duty to carry, and for a breach defendant is liable as much as for a failure to safely carry. · (*North Penn. Co.* v. *Commercial Bk.*, 37 Alb. L. J. 82 [U. S. Sup. Ct. 1887]; *Thurman* v. *Union Pacific Co.*, 106 N. Y. 579, 585; *Sherman* v. *Hudson River Co.*, 64 id. 254, 259.)    The goods were never delivered, but deposited on its closed pier in charge of its servants, for delivery to plaintiff, in the ordinary manner, and as fast as circumstances would permit removal.    After such deposit the defendant retained the possession as carrier and was liable for the delivery as carrier.    (*Gleadell* v. *Thompson*, 3 J. & S. 232, 238; affirmed, 56 N. Y. 194, 197; *Gould* v. *Chapin*, 20 id. 259, 264; *Rawson* v. *Holland*, 59 id. 611, 615, 616; *Redmond* v. *Liverpool Co.*, 46 id. 578; *Thompson* v. *Liverpool Co.*, 12 J. & S. 407, 410.)    The consignee had a reasonable time after arrival in which to remove the goods, and until such time expires they are at the risk of the carrier, who is absolutely liable therefor.    (*Redmond* v. *Liverpool Co.*, 46 N. Y. 578; *McKinney* v. *Jewett*, 90 id. 269.)    Reasonable time is such as, under all ordinary circumstances, affords an opportunity to remove the goods, and is to be determined from the circumstances of each case.    (*McAndrew* v. *Whitlock*, 52 N. Y. 40, 49.)    After the reasonable time allowed the consignee to remove goods has expired, the carrier is not thereby released, but becomes liable as warehouseman, and so continues as long as the goods are in its custody and control.    (*Fairfax* v *N. Y. C. Co.*, 67 N. Y. 11, 14; *Bank of Oswego* v. *Doyle*, 91 id. 32, 41, 42; *Collins* v. *Burns*, 63 id. 1, 5; *Canfield* v. *Baltimore Co.*, 93 id. 532, 538; *Red-*

*mond* v. *Liverpool Co.*, 46 id. 578 ; *Furman* v. *Union Pacific Co.*, 106 id. 579 ; *Wellington* v. *Morey*, 90 id. 656 ; *Vann* v. *Rouse*, 94 id. 402, 407 ; *City Bk.* v. *Rome, etc., Co.*, 44 id. 136, 144 ; *Penn. Co.* v. *Commercial Bk.*, 37 Alb. Law Jour. 82 ; *Viener* v. *N. Y., etc., Co.*, 50 N. Y. 23, 25.) Delivery by the carrier on the order of the consignee, the consignee holding the bill of lading, is proper and protects the carrier. (*Colgate* v. *Penn. Co.*, 31 Hun, 297, 300 ; affirmed, 102 N. Y. 120.) Refusal to so deliver renders the carrier liable to such persons for the damages sustained thereby. (*McEntee* v. *N. J. Co.*, 45 N. Y. 34, 37 ; *Furman* v. *Union Pacific Co*, 106 id. 579 ; *Colgate* v. *Penn. Co.*, 102 id. 120.) Evidence of the plaintiff's witness, Steckler, as to the statements of defendant's delivery clerk, Madigan, made to Steckler after the loss had occurred, was properly received, to the effect that the tin was lost, and that the only way he could account for the loss was that it had been stolen, not misdelivered. (*St. Nicholas Bank* v. *Savery*, 13 J. & S. 97, 106 ; *Titus* v. *Glens Falls Co.*, 81 N. Y. 410, 420 ; *Sherman* v. *Merchants' Bk.*, 77 id. 304, 308, 309 ; *Harvey* v. *N. Y. C. & H. R. R. R. Co.*, 19 Hun, 556 ; *Laning* v. *N. Y. C.*, 49 N. Y. 521, 538 ; *Chapman* v. *Erie Co.*, 55 id. 579, 584 ; *Board of Comrs.* v. *Burr*, 56 id. 665, 667 ; *Tenny* v. *Berger*, 93 id. 524, 531 ; *Dart* v. *Laimbeer*, 28 Week. Dig. 44 Ct. App. 1888 ; *Howell* v. *Hwyck*, 2 Abb. Dec. 423, 426 ; *Goodrich* v. *Weston*, 100 Mass. 362 ; *Butler* v. *Flanders*, 12 J. & S. 531, 532 ; *Lefler* v. *Field*, 52 N. Y. 621, 622 ; *McCotter* v. *Hooker*, 8 id. 497a, 502, 503 ; *Painton* v. *Northern Co.*, 83 id. 7, 14 ; *Colt* v. *Sixth Ave. Co.*, 49 id. 671 ; *Clemence* v. *City of Auburn*, 66 id. 334, 338.) The cause of action set forth in the complaint was for damages for non-delivery, whether the defendant was liable as carrier or warehouseman. (*Knapp* v. *Fowler*, 30 Hun, 512, 516 ; *Wellington* v. *Morey*, 90 N. Y. 656.) Plaintiff was entitled to recover on either ground of liablity which the evidence established. (*Starkweather* v. *Quigley*, 7 Hun, 26, 30 ; *Neftel* v. *Lightstone*, 77 N. Y. 96, 99.) There could not have been a delivery of the goods according to the bill of lading until the reason-

able time to remove them had expired. (*McKinney* v. *Jewett*, 90 N. Y. 269.)

*William Allen Butler* for respondent. The tin was duly delivered, and the relation of the defendant to it, as carrier, had terminated before the sixty-three slabs were found to be missing. (*Hedges* v. *H. R. R. R. Co.*, 49 N. Y. 223.) Even if the defendant had been a railroad company, its responsibility as a carrier would have ceased when the consignees of the tin, acting with diligence, had had a reasonable time to remove it. (*Richardson* v. *Goddard*, 23 How. 28; *Ely* v. *New Haven Steamboat Co.*, 53 Barb. 207, 216.) The liability of the carrier by sea continues as carrier only till such time, after notice to the consignee, as allows him opportunity to remove the goods, or to put them under proper care or custody. (*Hedges* v. *H. R. R. R. Co.*, 49 N. Y. 223; *Richardson* v. *Goddard*, 23 How. 28, 29; *The Eddy*, 5 Wall. 481, 495; *Ex parte Easton*, 5 Otto, 68, 75.) As warehouseman or bailee the defendant was responsible for only ordinary care, and negligence must be proved before a recovery can be had. (*Degraw* v. *Wilson*, 17 Fed. Rep. 698; *Hathorn* v. *Ely*, 28 N. Y. 78; *Whitworth* v. *E. R. Co.*, 87 id. 413, 421; *Lamb* v. *Western R. R. Co.*, 89 Mass. 98; *Richardson* v. *Goddard*, 23 How. [U. S.] 28; *Garside* v. *Trent Co.*, 4 T. R. 581.) As soon as the tin left the dock of the steamer the liability of the carrier as such terminated. (*The Santee*, 2 Benedict, 519.) The defendant was relieved by the provision of the bill of lading exempting from liability for robbers, thieves or loss, whether arising from the negligence, default or error in judgment of the pilot, master, mariners, engineers, stevedores, agents or other persons in the service of the ship-owner, and occurring before, during the voyage, or at the port of discharge. (*Wilson* v. *N. Y. C. & H. R. R. R. Co.*, 97 N. Y. 89, 93.) The defendant's relation to Lucius Hart & Co. after their cartman attended and took " possession of the tin " was not higher than that of bailee without reward. (*First Nat.*

*Bank* v. *Ocean Nat. Bank*, 60 N. Y. 278.) After an injury has been committed, the cause of action cannot be discharged by any act of the plaintiff short of a release or acceptance of something in satisfaction. (*Bowman* v. *Teall*, 23 Wend. 306, 308.)

ANDREWS, J. The bill of lading contained special clauses defining the obligation of the carrier in respect to the delivery of the goods, and also the duty of the consignees as to receiving them. By the first of the clauses referred to, the goods were "to be delivered from the ship's deck (when the ship-owner's responsibility shall cease), at the port of New York," and by the second it was declared that the goods were "to be received by the consignees immediately the vessel is ready to discharge, or otherwise they will be landed and stored at the sole expense and risk of the consignees, in the warehouses provided for that purpose, or in the public store, as the collector of the port of New York shall direct." Among the exceptions in the bill of lading is one against loss by "pirates, robbers, thieves, etc., whether such perils or things arise from the negligence, default or error in judgment of the pilot, master, mariners, engineers, stevedores, agents, or other persons in the service of the ship-owner, and occur before, during the voyage, or at the port of discharge." It is conceded that the sixty-three slabs of tin, the value of which the plaintiff seeks to recover in his action, have been lost and have never come to the actual possession of Mayer Bros. & Co., or their assignees. The necessary conclusion from the evidence is that they were removed from the wharf of the defendant after they had been discharged from the ship, by some one without authority of the true owner. The finding that they were not taken by theft leads to the alternative conclusion that they were taken by some person other than the true owner, by mistake, but with the passive acquiescence, at least, of the persons in charge of the wharf. If the original taking was not felonious, it is difficult to resist the conclusion that there was a subsequent felonious appropriation, in view of the fact that the property has never been

returned and that all efforts to trace it have proved unavailing. But whether taken by felony or mistake, there can be no reasonable doubt that the tin in question passed from the wharf of the defendants through the usual gate through which goods were taken, and under the observation of the persons in charge. The weight of each slab exceeded 100 pounds. The ship lay against the wharf. The wharf was enclosed on all sides. On the water side there was a gate for the discharge of cargo on to the pier. There were two other gates, one for the entrance of trucks and one through which the loaded trucks passed on leaving the wharf. It is a reasonable inference that whether the tin was taken by felony or mistake, the loss would have been prevented if the defendant's agents in charge of the wharf had required from the person taking the tin an exhibition of his authority, and had followed the rule prescribed by the defendant, requiring the gateman to inspect goods passing the gate and to take receipts from cartmen before permitting goods to leave the wharf. It is not claimed that any authority was exhibited to the defendant's agents other than the original order of Mayer Bros. & Co., indorsed to Lucius Hart & Co., on the twenty-eighth, to deliver the twenty-five tons of tin embraced in the order, nor that any receipt was taken by the gateman for the sixty-three missing slabs. The trial judge found, in substance, that the defendant never delivered the tin pursuant to its contract of carriage, but held it at the time of the loss in its capacity of carrier, subject to the rigorous liability imposed upon carriers by the common law, except as modified by the bill of lading, and that the tin was not lost by any of the perils excepted in the bill of lading. But the trial judge placed the right of the plaintiff to recover on an additional ground, viz., actual negligence on the part of the defendant's agents and servants in the care of the goods while on the wharf, by reason of which they were lost, and held that, assuming it was not liable as carrier under the contract of affreightment, it was liable for a breach of duty, to use ordinary care in the protection and preservation of the goods.

We concur in the conclusion of the General Term that the judgment of the trial court cannot be supported on the liability of the defendant, as carrier, under the bill of lading. The general principle that the duty and obligation of a common-carrier by water, does not, *ipso facto*, cease on the unloading of goods from the ship and their deposit upon a wharf, and especially where the place of discharge is also the terminus of the particular voyage, is the settled doctrine of this court and the generally accepted doctrine of the maritime law. The obligation of the ship-owner is not only to carry the goods to the port of destination, but to deliver them there to the consignee. But a delivery which will discharge the carrier may be constructive and not actual. To constitute a constructive delivery the carrier must, if practicable, give notice to the consignee of the arrival, and when this has been done and the goods are discharged in the usual and proper place, and reasonable opportunity afforded to the consignee to remove them, the liability of the carrier, as such, terminates. The duty of the consignee to receive and take the goods is as imperative as the duty of the carrier to deliver. Both obligations are to be reasonably construed, having reference to the circumstances. The stringent liability of the carrier cannot be continued at the option, or to suit the convenience of the consignee. The consignee is bound to act promptly in taking the goods, and if he fails to do so, whatever other duty may rest upon the carrier in respect to the goods, his liability, as insurer, is by such failure terminated. (*Redmond* v. *Liverpool Co.*, 46 N. Y. 578; *Hedges* v. *Hudson R. R. R. Co.*, 49 id. 223.)

In the present case prompt notice of the arrival of the goods was given by the defendant to Mayer, Bros. & Co. They were discharged from the ship on Monday, September twenty-seventh, and deposited on the proper wharf. The consignees had three full days thereafter in which they could have removed the tin, before the first of December, the day when the loss was discovered. They were not prevented from removing it from the wharf during those days by any act of the defendant, or by any *vis major*, and it is very clear that

its removal during that time was practicable in the exercise of due diligence by the consignees. (*Richardson* v. *Goddard*, 23 How. [U. S.] 28.)   Under these circumstances, the defendant, under the authorities, must be held to have made delivery of the tin under its contract as carrier, and to have discharged itself from its custody as such; and as the loss, upon the evidence and findings, must be held to have occurred after notice to the consignees of arrival, and the lapse of a reasonable time for the removal of the tin from the wharf, the General Term properly overruled the first ground of liability asserted by the plaintiff.   The general duty of a carrier to deliver, and of a consignee to receive, as defined in the authorities to which we have referred, is not, we think, essentially changed by the clause in the bill of lading that the goods are to be delivered "from the ship's deck, when the ship-owner's responsibility shall cease," or by the clause that the goods are to be received by the consignee "immediately the vessel is ready to discharge." (*Collins* v. *Burns*, 63 N. Y. 1; *Gleadell* v. *Thomson*, 56 id. 194.)   The defendant, in our view, are not liable as carrier for the reason that it had made delivery, as such, according to the general rule governing the liability of carriers by water.

But this conclusion does not meet the other ground of liability asserted, and found by the trial court, viz., that the defendant neglected to exercise due and proper care of the tin and negligently permitted it to be taken from its wharf by strangers, which is the substance of the findings on this branch of the case.   It is claimed by the learned counsel for the respondent that this cause of action was not alleged in the complaint, and that the action was brought exclusively upon the contract of affreightment, and the duty of the defendant to make delivery under the bill of lading.   The case was tried upon both theories of liability, and no objection was made that a cause of action for negligence, in not properly caring for the tin after the strict liability of the defendant as carrier had ceased, was not within the issues.   It is now too late to take this objection. (*Wellington* v. *Morey*, 90 N. Y. 656; *Vann* v. *Rouse*, 94

id. 407.)   There can be no doubt, we suppose, that in many cases a carrier's whole duty in respect to goods carried by him is not discharged by a constructive delivery terminating his strict responsibility as carrier.   Although a consignee may neglect to accept or receive the goods, the carrier is not thereby justified in abandoning them, or in negligently exposing them to injury.   The law enables him to wholly exempt himself from responsibility in such a contingency by giving him the right to warehouse the goods.   When this is done he is no longer liable in any respect, and if they are subsequently lost by the negligence of the warehouseman, the carrier is not liable. (*Redmond* v. *Liverpool Co.*, 46 N. Y. 578, and cases cited.) But so long as he has the custody of the goods, although there has been a constructive delivery which exempts him from liability as carrier, there supervenes upon the original contract of carriage by implication of law, a duty as bailee or warehouseman to take ordinary care of the property.   This duty of ordinary care rested upon the defendant in this case. The tin, it is true, was placed by the act of the defendant under the dominion of the consignees for the purposes of weighing and removal, but, nevertheless, as between the defendant and the consignees and their assignees, the actual custody of the part not removed by the consignees or their assignees, remained at all times in the defendant.   It was deposited on its private wharf, to which alone it, its servants, and those permitted by it had access.   The tin could not have been removed against their consent.   It was, in fact, removed by some one unknown, by their tacit acquiescence, doubtless without any fraud on their part, but, nevertheless, its removal by a stranger was made possible by reason of an omission on the part of the defendant's servants to take the precautions against misdelivery which the defendant had deemed it proper to prescribe to prevent such an occurrence.   The trial court found that the omission to take these precautions was negligence.   We do not perceive why this finding is not supported by evidence.   If there was negligence on the part of the servants of the defendant which occasioned or contributed to

the loss, the doctrine of *respondeat superior* applies and makes it in law the negligence of the defendant. The delay of the consignees in removing the tin had no legal connection with this breach of duty by the defendant, and cannot justly be considered as a concurring cause of the loss. The exceptions in the bill of lading of loss by thieves, etc., do not exempt the defendant from liability, for the reasons, *first,* that it was found by the trial court that the tin was not lost by theft; and, *second,* by the true construction of the contract the perils excepted were those which should happen before or during the voyage and while the goods were in the possession of the carriers as such under the bill of lading.

Upon the whole case we are of opinion that the original judgment is supported upon the ground of actual negligence of the defendant after the contract of carriage had been performed in omitting to exercise ordinary care in the custody of the tin. It was found by the trial judge, upon the request of the counsel for the defendant, that the plaintiff owned, by assignment, the claim in suit, and no question can now be made as to the right of the plaintiff to maintain the action.

For the reasons stated, we think the General Term erred in reversing the judgment, and the order of reversal should, therefore, be reversed, and the judgment of the trial court affirmed.

All concur, except EARL and GRAY, JJ., not voting.

Order reversed and judgment affirmed.