No. 13,198.

M. L. SILVERMAN VS. ST. LOUIS, IRON MOUNTAIN AND SOUTHERN RAILWAY COMPANY.

SYLLABUS.

1. Where merchandise is shipped in apparent good order and is claimed to have been damaged, whilst in the possession of the carrier, under circumstances which render the carrier liable, the burden of proof rests upon the party seeking to recover to show, at least, that damage has been sustained.
2. The measure of damages in such a case is the difference between the value of the goods in their damaged state, and their value at the place of destination had they been delivered in good order.
3. Where the shipment consists of a number of boxes of assorted merchandise, damage to some of the boxes does not entitle the consignee to reject the entire lot, and recover, as for total loss. The doctrine of abandonment as for total loss does not apply to contracts of affreightment.
4. When the consignee refuses to receive any part of the shipment, or to co-operate in examining the goods, and claims reimbursement as for total loss, the carrier will not be held guilty of "converting" the goods, by reason of calling in disinterested and competent persons and having broken packages re-packed, and unbroken packages opened and examined in order to ascertain the character and condition of their contents.

APPEAL from the Fifth Judicial District Court for the Parish of Ouachita. *Potts, J.*

*A. A. Gunby* for Plaintiff and Appellant.

*Hudson, Potts* and *Bernstein* for the Defendant and Appellee.

Argued and submitted May 29, 1899.

Opinion handed down June 22, 1899.

Rehearing refused June 30, 1899.

The opinion of the court was delivered by

MONROE, J. Plaintiff sues for the alleged value of certain goods shipped over the defendant's road, and for other loss and damages said to have been sustained in connection with said shipment, and resulting, as he claims, from defendant's negligence. The aggregate amount claimed is $5,389.30, made up of the following items, to-wit: Cost price of goods, $3,890.46; ten per cent. advance thereon, as the value at the time of shipment, bringing the claim up, according to the petition, to $4,389.50 (this, however, is an error in calculation, as 10 per cent. added to $3,890.46 would make $4,279.50, and not $4,389.50); three months rent of store and clerks hire, 25 per cent. loss of profit on goods which he would have sold, personal expenses and loss of time, etc., $1,000.00.

The answer denies, generally and especially, the averments upon which the claim is based.

The facts, as we find them from the evidence in the record, are as follows: The plaintiff had been in business in 1897, in Harper, Kansas, where he remained four weeks; he then moved to Alva, Oklahoma, where he stayed ten weeks; he then shipped most of his unsold stock to Conroe, Texas, where he and his brothers were engaged in business, whilst he himself took the rest of the goods to St. Louis. Sometime in 1898 he shipped this balance of stock, with some other goods that he had collected whilst in St. Louis, to Monroe, in the parish of Ouachita, where he rented a store and engaged in business for a few months, during which time he received additional goods from St. Louis, and made sales—selling, as he says, goods which cost him $400.00, for $600.00.

This may have been the case, but no one could know it but himself, as he kept no books, and there were no cost or selling marks on the goods, and no prices were fixed, except by him, and that for the purpose of each transaction. The stock consisted of clothing, shoes, "gents'" furnishing goods, notions, and cheap jewelry, etc. It was a cheap stock throughout, largely made up of shop-worn goods, intermixed with men's and women's second-hand wearing apparel. It is true that the plaintiff denies that he had any second-hand goods, and

is supported in this by Gumbiner, his clerk, but the evidence in the record, taken as a whole, convinces us that he had.

Upon October 4, 1898, having packed his stock in thirty-six boxes, he shipped it to Columbia, in the parish of Caldwell, where he had rented a store for the months of October, November and December, at ten dollars per month, paying one month's rent in advance. The boxes reached Columbia safely upon the morning of the 4th, and the plaintiff, with his clerk, arrived in the evening of the same day. He took lodgings at a hotel, and the next morning, October 5th, was told by his landlord that the car containing his goods had been broken open during the preceding night and some depredations committed upon his goods. He, thereupon, went with his clerk to the depot, and found that he had been correctly informed. The depot is situated in a cut in a hill, and, in rainy weather, is not convenient of access because of the mud which forms around it. It is the custom, therefore, to leave cars, which are to be unloaded, at a point, on the switch, from two hundred and fifty to three hundred feet south of the depot, where it is dryer and more accessible. The car containing plaintiff's goods had been left there, with the doors slightly fastened by a seal (being a wire twisted through staples, and having its ends fastened together with a small piece of lead), and without any watchman. During the night it had been broken into by some unauthorized and unknown persons, and eight of the boxes containing plaintiff's goods had been opened, and their contents disturbed and removed; two of said boxes had been thrown out of the car, whilst the disturbed goods were scattered about on the ground and in the car. The plaintiff did not examine the goods to ascertain whether they were injured, or enter the car, or look into it, for the purpose of finding out how many boxes had been opened; nor did he make any attempt to ascertain what goods, if any, were missing. He stayed at the depot but a few minutes, informed the agent that he would not receive the goods— returned to his hotel; and, in the afternoon, went with his clerk, back to Monroe. Nor did Gumbiner, the clerk, get into the car, or handle the goods, to see whether they were damaged, and, though he testifies that, as far as he could see, the boxes had all been opened, he also testifies that he does not know whether he would have noticed it, if twenty-six of the thirty-four boxes had remained unopened. Other testimony upon the subject, that of Bush, the agent; Nelson, the section hand, and Clark, a young member of the bar, who were on the

spot on the morning of October 5th, and of Banks, Waggoner, Bern stein, and Clark, who subsequently examined and inventoried the goods, leads us to the conclusion that there were only eight of the boxes opened, and that whilst their contents were somewhat scattered about, they were not appreciably injured. There was no mud, and the goods, such as coats, clothing, shoes, etc., were not hurt by being thrown on the dry ground, or upon the floor of the car. Upon plaintiff's refusal to accept the goods, the agent placed a man in charge of them until he could get instructions from his superior officer, and, having received such instructions in the course of the morning, he had the goods repacked and the boxes numbered so as to distinguish those which had been opened from those which had not. In repacking, he found that he was unable to get all the goods into the boxes from which they had been taken, and he made use of two additional boxes—a starch box and a cracker box, which he says were small. Some of the paper boxes which had held shoes, having been taken out and scattered about, were burned as rubbish. In this connection it may be said that the evidence shows that the stock was altogether irregular, and the shoes found in boxes which came out of the broken packages, and also those found afterwards in the packages which had not been broken into, were not packed with any uniformity, or with any regard to the proper cartons in which they were supposed to have come from the manufacturer.

Upon the same day upon which all this occurred, the town authorities declared quarantine against the world for the purpose of keeping out yellow fever, which was supposed to be prevailing in some other places. So that the plaintiff having returned to Monroe, was unable, or supposed he was unable, to get back to Columbia. He placed his case in the hands of counsel who now represents him, however, and it was, by him, brought to the attention of the counsel for the railroad company, at whose request the plaintiff prepared a detailed list of his goods, and placed a valuation on them. The company secured the services of a detective, who made his way, past the quarantine, into Columbia, but, whilst it is said that he obtained some information as to the depredators, it was insufficient to satisfy the Grand Jury, and there was no prosecution. Their identity, and their motives, are, therefore, left to conjecture. The counsel for the road, then, upon October 22nd, notified plaintiff's counsel that the road was ready to deliver the goods, and received, in reply to his communication, a

letter from the plaintiff's counsel, dated October 29th, declining to receive the goods, and insisting upon the payment of their value as per the statement which had previously been submitted, as also upon payment of other damages claimed. About this time, October 29th, the Columbia quarantine was raised, and an agreement was arrived at, by the respective counsel, to visit the scene of the trouble, together, and, if possible, arrange a settlement. The plaintiff was expected (at least by the defendant's counsel), to have been of the party, but, for some reason, not explained in the record, did not go. The two attorneys reached Columbia in the evening, and, going to the depot, or warehouse, of the railroad company, found themselves in the presence of a number of boxes of assorted merchandise, piled one upon the other, but with no personal knowledge of what ought to be found in them. They, therefore, returned to their hotel, and, upon the following morning, departed as they had come. Defendant's counsel testifies that he proposed that disinterested and competent persons should be called in, the boxes opened, the goods examined, and the damage or loss, if any, ascertained and appraised. The counsel for the defendant does not seem to remember this proposition. We are inclined to think, however, that, aside from the general doctrine that the affirmative is the stronger in such cases, the circumstances render it probable that some proposition was made. Otherwise it would be difficult to account, satisfactorily, for the journey to Columbia. Either of the counsel might have gone alone, in the interest of his side of the case, but as they went together, and by agreement, and it is admitted that the common purpose was the settlement of the claim, it would seem rather remarkable if no proposition whatever was made upon the subject. Thereafter, one of the attorneys for the defendant notified plaintiff's attorney that he was going to have the boxes opened by disinterested and competent persons, in order to ascertain, as far as possible, what damage, if any, had been done, and he notified the plaintiff's attorney to be present in person, or by representative; this suggestion being declined, the plaintiff called upon Messrs. Blanks and Waggoner, shown to be prominent merchants in Columbia, and upon Mr. Clark, who had had some experience in commercial life, and the boxes were opened and a detailed inventory made of their contents. The witnesses who prepared this inventory testify that, from the character of the goods, and the condition in which they were found,

these which had been taken out of the boxes had sustained no damage whatever, but were in as good condiiton as those which were in the boxes that had never been broken open. Some of the articles produced in the lower court consisted of men's and women's wearing apparel, some with the stains of perspiration upon them, some with lining of different ages, and some with other indications of previous use.

The inventory thus made includes a considerably greater number of articles than appear upon the list which the plaintiff had furnished as the basis of his claim, of which the following history is given, to-wit: The plaintiff testifies that when he shipped his goods from St. Louis to Monroe, he made a pencil list of them. After he reached Monroe, he sold goods and received others, but kept no record of his business, and when he shipped his stock to Columbia he made no inventory of it. His method, therefore, of arriving at the list furnished by him to his attorney as being a correct list of the articles in the boxes in question, was, to take the list of the goods shipped from St. Louis to Monroe, estimate, from memory, what he had received, and what he had sold after reaching Monroe, and add, and subtract, the same to, and from his St. Louis list. An effort seems to have been made, without success, to get into court the St. Louis list thus referred to, the list furnished to the defendant being a type-written instrument, made in the office of plaintiff's attorney from *data* thus made up and furnished by the plaintiff. As to the manner in which the list was made, and as to the extent of his knowledge concerning the loss or damage for which he claims compensation, the plaintiff gives the following testimony, to-wit:

"I gave my lawyer a list of the goods, and he made out the list that I swore to. I made the list when I packed the goods in the cases at St. Louis, I refer now to the itemized list. Then I added and subtracted for the estimated business done while I was in Monroe. * * * Yes, the cost prices are truly and correctly noted in the list. * * * I shipped from St. Louis to Monroe all the goods which are itemized in this list, and about $475.00 worth more. * * * These goods were shipped at different dates during August and September, 1898. These goods cost the amount shown by the list, less $400.00 for goods sold in Monroe. * * * The goods were worth to me the amount mentioned in the said list, with ten per cent. added, as shown in the list. * * * I was damaged altogether; that is for the cost

FIFTY-FIRST ANNUAL REPORTS, 1899. 1791

Silverman vs. St. Louis, Iron Mountain & Southern R. R. Co.

of goods and for the expenses attending their handling. * * * I did not make any new inventory of the shipment to Columbia.

"Q. Can you tell any particular amount of goods sold by you in Monroe, La., or accertain with certainty what goods were shipped by you from there to Columbia?

"A. No sir, I can't tell that. * * * I found the car open and the goods were thrown out and piled up, and the car was standing right near a washout, or gully, and the goods were down in the gully, and on the track by its side. My eyes got dark, and I could not see anything. * * * So the goods were useless, even if I would have liked to have done anything; they were not in shape for me to start business. * * * My young man, Gumbiner, was with me at the time. He got into the car, while I was there. I did not get into the car. * * * I did not receive the goods. because it was useless for me to receive them; I could not open up business with such of the goods as were in merchantable condition; I needed the whole assortment to open up with. * * * I saw the goods as they lay there on that Wednesday morning, but did not handle them; I did not examine them. * * * I just saw the goods there piled in that condition, and I did not see any more. * * * I did not examine the goods, and I can not give any item of damage. * * * All the boxes were broken open. Mr. Gumbiner said he could find no solid ones. * * *

"Q. Was any of your goods missing, and, if yes, what goods were missing, and their value?

"A. I can't tell that, as I did not examine them."

Gumbiner, who the witness thus testifies got into the car and gave him the information as to the number of boxes broken open, says in his testimony: "As far as I could see, every box was broken open, and the goods were thrown out. I did not get into the car, but I looked in; there was a little loose goods in the car. * * * I do not know whether any of them were stolen or missing.

"Q. Suppose you had taken stock, would you have been able to have told whether any of the goods were destroyed, lost, missing, or stolen?'

"A. I don't know whether or not I could have told, I did not see any invoice or books of goods. * * *

"Q. If as many as twenty-six of the thirty-four boxes had not been touched at all, would you not have seen and noticed it from your examination?

1792        SUPREME COURT OF LOUISIANA.

Silverman vs. St. Louis, Iron Mountain & Southern R. R. Co.

"A. I don't know; I was not in the car, but I looked in.  *  *  *
I did not handle any of the goods on October 5th, nor did I see Mr.
Silverman examine them.

"Q. Are the prices, charged on the list which you have mentioned,
fair and reasonable for the goods, or for such goods as were packed
and sent by Mr. Silverman to Columbia?

"A. I will tell you how it is about this; his goods were not marked.
I am not an expert to judge what the goods were worth."

The stock consisted of two or three thousand articles of assorted
merchandise, some of which had been carried from Oklahoma to St.
Louis, and most of which had been carried from St. Louis to Monroe,
before being taken from Monroe to Columbia. Plaintiff was in busi-
ness at Monroe for two months, during which time he and his clerk
were selling goods, and, now and then, receiving additions to the
stock. Under these circumstances, for him to have carried, in his
mind, the mutations of his stock, so as to be able to testify positively
as to the correctness of the list upon which he sues, is a phenomenal
exhibition of memory, and all the more remarkable as coming from
the plaintiff, because his memory seems to be at fault as to some other
matters which would appear to be more easily remembered. Thus,
Gumbiner was his only clerk, in October, 1898, and had been in his
employ only three weeks, and it would be reasonable to suppose that
the plaintiff would be able to remember the terms upon which he was
employed, and the amount of his salary. He alleges, in his petition,
that he had employed Gumbiner for three months, at $75.00 per
month, and that he was bound to him for that time and amount, and
he also swears to it. Gambiner himself testifies that he was employed
by the month, at $45 per month, and we infer from his testimony that
there is nothing due him.

Being asked when and from whom he purchased the goods enumer-
ated in the list furnished by him, he says: "It was too many to men-
tion from whom I purchased the goods. I can't recollect them all.
They were purchased by me wherever I could buy them satisfactorily
to me. I can not give the dates of the several invoices; I can not
give the names of the parties from whom those goods were pur-
chased."  *  *  *

As we have seen, Gumbiner, who was his clerk at the time, declines
to testify as to the value of the goods. Upon the other hand, Kuhn,
who had been employed by him on his arrival in Monroe, testifies as
follows:

"There were second-hand goods in this stock. I assisted in opening up the stock when he first came to Monroe; they were a regular cheap line of goods. I do not know how such goods are usually bought. There were shelf-worn goods in the stock. Camphor had been packed with the clothing."

And this testimony is corroberated by that of Blanks, Waggoner, Bernstein and Clark, who examined the goods at the depot at Columbia, and also by the goods themselves, produced on the trial in the court below. It is true that counsel for plaintiff suggests that the inferior goods found scattered about the depot may have been put there by the same persons who broke the boxes open. Accepting this as probable, it fails to account for the fact that goods of the same character were in the stock before it left Monroe, and were in the boxes which were not opened by the depredators.

These being the facts disclosed by the evidence, we find no principle of law upon which to predicate a judgment for the plaintiff. It may be conceded that the defendant was at fault for leaving plaintiff's property in an insecurely fastened and isolated car, with no one to watch it, nevertheless, the plaintiff can not recover, without proving what, if any, injury this negligence of the defendant's has caused him.

The preponderance of evidence leads to the conclusion that plaintiff's goods were neither lost nor damaged. As far as we can see, there was no sufficient reason to have prevented his taking possession of them on the morning of October 5th, and if, in doing so, he had been subjected to trouble and expense, in collecting and repacking them, the defendant would have been liable therefor. He, however, refused at that time, and has since refused, to receive the goods, or any part of them, or to have anything to do with them, and the defendant was obliged to accept the alternative of taking such steps as seemed prudent, for the preservation of the goods thus left on its hands, and for its own protection against the claim with which it was threatened, and it accordingly collected the goods and repacked them. We do not understand that, in case of the loss or damage of part of a lot of assorted goods, the carrier is bound to purchase the whole consignment, at the shipper's price, with expected profit added.

In Henderson & Gaines vs. Ship, Maid of Orleans, 14 Ann., 352, this court said:

"The packages being stained by water, when delivered, were opened, and their contents examined by disinterested and competent judges,

called in for that purpose, who testify they were damaged by salt water to such an extent as to make them worthless, but that they might have produced, at auction, from thirty to forty per cent. of their invoice price. The plaintiffs have sued the ship for the total value of the goods, as in case of non-delivery. This course of proceedings is unusal, and not warranted by precedent. The measure of damages is the difference between the value of the goods in their damaged state, and their value at the port of destination, had they been delivered in good order. *Rathborn vs. Neal,* 4 Ann., 566. That difference in value should have been ascertained by a public sale to the highest bidder. *Greenwood vs. Cooper,* 10 Ann., 796.

"The doctrine of abandonment for a constructive total loss has never been applied, that we are aware of, to the contract of affreightment."

Affirmed in *Smith vs. Bark W. H. Wall,* 18 Ann., 724.

In the instant case the plaintiff might have arrived at the extent of the damage in either of two ways, but he elected to abandon, as for a total loss—a course of proceeding which, as is said in the opinion above quoted, "has never been applied * * * to contracts of affreightment." See also Rapp & Mack, Dig. Vol. 2, Nos. 237, 140, 771.

The learned counsel for the plaintiff, however, claims that there has been a conversion of the property, by reason of the defendant's having had the packages opened, and that defendant is liable, for that reason, for their entire value. It is, no doubt, true that such liability may attach where the carrier improperly, and without legal justification, opens the packages entrusted to him for transportation. But the plaintiff's case does not, we think, fall within that category. He had refused to receive the goods, or to examine them, or to have anything to do with them, and was claiming a large sum, as their value, before the defendant opened the boxes. The goods were in defendant's possession, and it was bound to take such action concerning them as would minimize the alleged loss, whether that loss was eventually to fall upon it or upon the plaintiff. This obligation involved the exercise of discretion, which we do not consider was abused in opening the boxes for the purpose of ascertaining the character and condition of their contents, and, if necessary, taking steps to preserve them. Rapp and Mack's Dig., Vol. 2, Nos. 239, 240.

For these reasons it is ordered, adjudged and decreed, that the judgment appealed from be affirmed.