(70 South. 44)

No. 21425.

BURKENROAD GOLDSMITH CO., Limited, v. ILLINOIS CENT. R. CO.

In re ILLINOIS CENT. R. CO.

(Oct. 18, 1915. Rehearing Denied Nov. 15, 1915.)

*(Syllabus by the Court.)*

1. CARRIERS ⬳177—INTERSTATE SHIPMENT—LIABILITY OF INITIAL CARRIER — NEGLIGENCE.

Under the Carmack Amendment to the Interstate Commerce Act (Act Feb. 4, 1887, c. 104, § 20, 24 Stat. 386, as amended by Act June 29, 1906, c. 3591, § 7, 34 Stat. 593 [U. S. Comp. St. 1913, § 8592, pars. 11, 12]), the initial carrier, as principal, is liable not only for its own negligence, but that of any agency which it may use, and is considered to have adopted its connecting carrier as its agent.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 775–789, 791–803; Dec. Dig. ⬳177.]

2. CARRIERS ⬳177—DAMAGE TO SHIPMENT—LIABILITY OF INITIAL CARRIER.

Where a carload of feed was water-damaged in transit, and the sealed car was delivered at the point of destination to a branch railroad for delivery to the consignee, and was by him rejected on account of said damage, and the loaded car was thereupon returned to the delivering carrier, and the feed suffered further depreciation, before it was sold by said carrier, *held*, that the initial carrier is liable for the damages to the feed not only from water, but from the failure of its agent, the delivering carrier, to promptly dispose of the feed to the best advantage.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 775–789, 791–803; Dec. Dig. ⬳177.]

3. CARRIERS ⬳86 — CARLOAD SHIPMENTS — RIGHT OF INSPECTION.

Every consignee is entitled to an inspection of goods shipped in carload lots before he is bound to accept or reject the shipment.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 316–322; Dec. Dig. ⬳86.]

Certiorari to Court of Appeal, Parish of Orleans.

Action by the Burkenroad Goldsmith Company, Limited, against the Illinois Central Railroad Company. A judgment for defendant was reversed by the Court of Appeal, and defendant applies for certiorari or writ of review. Affirmed.

Hunter C. Leake, Gustave Lemle, W. Catesby Jones, and Arthur A. Moreno, all of New Orleans (Blewett Lee and R. V. Fletcher, both of Chicago, Ill., of counsel), for defendant appellant. Charles Rosen, of New Orleans, for plaintiff appellee.

LAND, J. The case is stated by the Court of Appeal as follows:

"Plaintiff represents that on April 26, 1912, it delivered unto defendant, at Memphis, 300 sacks of feed to be carried to Starks, La., and delivered to the Lutcher-Moore Turpentine Works, to whom the plaintiff agreed to sell said feed for the price of $568.95; that while in the possession of the defendant said feed was damaged, and when it arrived at Starks, on May 18, 1912, it was wet, hard, and lumpy, and unfit for use and worthless, in consequence whereof the said Lutcher-Moore Turpentine Works, consignees, refused to accept said feed or pay the price thereof; that on June 14, 1912, petitioner filed its claim with the defendant which refused to pay the same, and petitioner prays for judgment for $568.95 with legal interest from June 14, 1912, till paid, and $50 penalty.

"The defendant answers that it delivered the feed at Starks in the same condition as received, and that the bill of lading properly indorsed was surrendered to it, and it denies that when the feed arrived at Starks it was wet, hard, and lumpy and worthless."

There was judgment for defendant, and plaintiff has appealed.

The Court of Appeal, by a majority decision, reversed the judgment of the district court, and rendered judgment in favor of the plaintiff for the amount sued for, with interest and costs.

St. Paul, Judge, handed down a dissenting opinion reading as follows:

"I dissent. I think the plaintiffs should recover the sum of $65.00, amount of damages admittedly due this defendant; and are of course entitled to receive from the Kansas City Company the net proceeds of the shipment, which latter company appears to have acted for the best advantage of whosoever might be concerned. But I am of opinion that plaintiffs were at fault in not taking charge of their own property, holding the defendant for the actual damages, and the consignees for all other losses due to their refusal to accept the sound part of the shipment.

"The effect of the present opinion, however, is to permit plaintiffs to do exactly what they claim the right to do, viz., to abandon the shipment, and hold the carrier for its value, and I do not understand that to be the law."

The statements of facts in the opinion of the Court of Appeal is to the effect that the feed was shipped in good condition, and when tendered to the consignees was found damaged and unfit for use, and was for that reason rejected by them; that after this rejection the car of feed was returned to the Kansas City Railroad, a connecting carrier, which, after an unreasonable delay, transported it to Shreveport, and there sold the feed at public auction in July, 1912.

The feed was sold for $210. The Court of Appeal held that the cost of transporting the feed to Shreveport could not be charged to the plaintiffs, and, as the price was not in their hands, gave them judgment for the invoice price at the place of delivery.

In the original answer the defendant averred that the shipment was duly transported to Starks, La., over respondents' road, and its connecting carriers, including the Kansas City Southern Railroad Company, and at said place the bill of lading was surrendered, and the feed, in the same condition as received by the defendant, was delivered by the holder thereof. In the same answer the defendant denied that the feed when it arrived at Starks, La., was wet, hard, and lumpy, and unfit for use and worthless.

Defendant denies liability for damage accruing after surrender of the bill of lading and the delivery of the car at the point of destination to the holder of the bill, the Gulf, Sabine & Red River Railroad Company, acting for the Lutcher-Moore Turpentine Works, the purchaser of the feed from the plaintiff.

It appears that, when said railroad company tendered said car of feed to said turpentine works, the latter refused to receive the same on account of the damaged condition of the shipment; and that, thereupon, said railroad company returned the car to the Kansas City Southern at Starks, and that company, after holding the feed for some six weeks, had the same transported to Shreveport and sold for $210.

The Court of Appeal held the defendant responsible for the actions of the Kansas City Southern Railway in the premises.

The feed when sold in Shreveport was found by an appraiser full of weevils and bugs and therefore unfit for food for animals. The appraiser found "slight damage caused by wet." One Chambers, a former employé of the Gulf, Sabine & Red River Railroad Company, deposed that the car of feed was wrecked on said road, and its contents were transferred to another car; and that:

"The feed in the car was rotten from the bottom of the car upward a depth of about four feet. * * * There was a water or mudline on the walls of the car inside."

He further deposed that the feed was not damaged on his road.

Another witness testified that the feed when loaded on the car at Memphis was fresh and in sound condition. Hawkins, a salesman of plaintiff, deposed that he examined the feed twice, once at Starks, in the presence of an agent of the Kansas City Southern Railway, and he found the feed damaged and unfit for use for stock feed.

The agent referred to deposed that some of the sacks were wet and caked, and others

good, and that he estimated the damage at $65.

The reasonable conclusion from the evidence is that the car of feed, when delivered in May, 1912, at Starks, La., was water-damaged, and unfit for the purposes for which it was sold.

The shipper and the Kansas City Southern Railway acquiesced in the rejection of the carload by the consignees.

In July, 1912, the car was carried by the Kansas City Southern Railway to Shreveport, and the feed was there sold at public auction for $210 to pay freight charges amounting to $106.50. The net proceeds of the sale amounted to $80.60 which the plaintiff refused to accept.

The agent of the Kansas City Southern Railway at Starks, La., deposed that the bill of lading was surrendered by the Lutcher-Moore Company, and the car was delivered to the Gulf-Sabine Railroad Company; and that the camp of the Lutcher-Moore Company was located on said railroad about five miles from Starks.

· This case comes before us on a writ of review, and the defendant assigns error as follows:

(1) The Court of Appeal erred in holding defendant, the initial carrier, responsible for damages that accrued to the feed subsequent to the delivery of the shipment at Starks, La., the destination named in the bill of lading.

(2) The Court of Appeal erred in holding that consignees can decline to receive a shipment slightly damaged, abandon it, and recover from the initial carrier for a total loss.

[1] "Under the Carmack Amendment to the Interstate Commerce Act, the initial carrier is, as principal, liable not only for its own negligence, but that of any agency which it may use, although as between themselves the carrier actually causing the loss may be primarily liable." See syllabus in Atlantic Coast Line R. Co. v. Riverside Mills, 219 U. S. 187, 31 Sup. Ct. 164, 55 L. Ed. 167, 31 L. R. A. (N. S.) 7. The syllabus is fully supported by the text of the opinion. It is true that in that case the freight was lost in transit over a connecting line, but the opinion of the court defines generally the relation existing between the initial and connecting carriers under the Carmack Amendment, as shown by the following extracts:

"Reduced to the final results, the Congress has said that a receiving carrier, in spite of any stipulation to the contrary, shall be deemed, when it receives property in one state to be transported to a point in another, involving the use of a connecting carrier for some part of the way, to have adopted such other carrier as its agent, and to incur liability throughout the entire route."

[2] Under this doctrine, the Kansas City Southern Railway, the delivering carrier, was the agent of the defendant, in all matters relating to the delivery of the goods and their preservation or disposition after rejection by the real consignee.

The agent of the defendant, after discovery of the damaged condition of the shipment, acquiesced in its rejection by the consignee, and took possession of the feed for account of the shipper or owner. This same agent, after a delay of some six weeks, transported the feed to Shreveport, and caused it to be sold at public auction.

The first assignment of error is based on the predicate that the agency of the delivering carrier absolutely ceased on surrender of the bill of lading and the delivery of the car to the Gulf-Sabine branch line. The delivery of the bill was, as usual, required before delivery of the goods. The delivery of the car of damaged feed was not a compliance with the contract of affreightment to deliver in like good order as when received by the initial carrier.

The Gulf-Sabine Railway was simply a common carrier, and was not the agent of

the consignee for the purpose of accepting or rejecting goods damaged in transit over other lines. The consignee promptly rejected the shipment, and the Gulf-Sabine Railway returned the car to the Kansas City Southern Railway, which accepted it without objection. The plaintiff acquiesced in the rejection of the shipment.

The result was that the Kansas City Southern Railway held possession of the car of feed for account of the owner.

We are of opinion that the Kansas City Southern Railway throughout this transaction acted as the agent of the defendant railroad company.

In the case of Silverman v. Railroad Co., 51 La. Ann. 1785, 26 South. 447, the shipper refused to accept any of his assorted goods because a part of them were missing. The court also held that, the goods being in defendant's possession, "it was bound to take such action concerning them as would minimize the alleged loss, whether the loss was eventually to fall upon it or upon the plaintiff." See, on this subject, Scheu v. Benedict, 116 N. Y. 510, 22 N. E. 1073, 15 Am. St. Rep. 426, and Tarbell v. Royal Exchange Shipping Co., 110 N. Y. 170, 17 N. E. 721, 6 Am. St. Rep. 350, as to the duty of common carriers to take care of rejected shipments and to preserve the property from injury. Hence in this case the agency of the delivering carrier did not terminate on the delivery of the damaged car of feed to another carrier, for transportation to the consignee, who promptly rejected the shipment. Cases where the consignee received the shipment and retained possession of the same have no application.

In a case of decaying fruit, it has been held that the carrier should make ordinary diligent effort to sell the fruit at the best price obtainable. Hull v. Mo. Pac. R. R., 60 Mo. App. 593.

In the case at bar the preponderance of the evidence is to the effect that the sacks of feed at the bottom of the car were badly damaged by water, and, as stated by plaintiffs' salesman, the other sacks had become heated, sour, and unfit for food for live stock. His testimony and other evidence indicate that the damaged feed could have been used only to feed hogs or in the manufacture of fertilizers. The Kansas City Southern Railway did nothing to minimize the damage for six weeks, and then sent the car to Shreveport. On arrival the feed was found to be full of weevils and bugs, and part of it watercaked. The feed was sold at public auction for $210, but freight and other expenses reduced the net proceeds of sale to $80.60.

A witness for defendant estimated the damage at $65, or about 10 per cent. On this basis 90 per cent. of the feed was sound, and when this estimate was made in June, 1912, the sound part was worth about $600. As the feed sold only for $210 in Shreveport, in July, 1912, the subsequent depreciation must have amounted to about $400, if the estimate of the witness be correct. But, under our view of the case, the defendant is liable not only for the damage before but after the alleged delivery, which combined have caused the plaintiff to lose the invoice price of the feed at Starks, La.

[3] In addition to what we have said, we may add that the Carmack Amendment treats the delivering carrier as agent of the initial carrier for all purposes connected with the delivery of freight. The duty of a railroad company under a contract of affreightment does not terminate with the technical delivery of a sealed car of goods, damaged in transit, on a siding, or to another carrier for delivery to the consignee who on inspection discovers the damaged condition of the goods, and rejects the shipment in the exercise of his legal right. 6 Cyc. 465.

The damage having been caused by the initial carrier or its agents, a rejection for such damage imposes on the carrier and its

agents the duty to preserve the property and to minimize the injury. The Carmack Amendment considers the initial and connecting carriers as forming one single system for the transportation of freight. Defendant's contention would restrict the agency of the last carrier to the delivery of sealed cars, regardless of the right of consignees to reject shipments.

Such a doctrine would relieve the initial carrier from liability for the acts of its agents in dealing with all kinds of rejected shipments. The Carmack Amendment contemplates no such scheme of divided responsibility between the initial and delivering carriers. The duty to conserve property in a case like this flows from the contract of carriage. If a common carrier cannot deliver, it must preserve the property. As to the second assignment of error, the evidence shows that the shipment was materially damaged.

It is therefore ordered that the judgment of the Court of Appeal be affirmed; costs of this application to be paid by the defendant.