DAVID CRYSTAL, INC., Libellant,

v.

The CUNARD STEAM-SHIP COMPANY
Limited, Respondent Petitioner,

and

John T. Clark & Son, Respondent-
Impleaded Petitioner,

and

Penson & Company, Respondent-
Impleaded.

United States District Court
S. D. New York.

Oct. 10, 1963.

Bigham, Englar, Jones & Houston, New York City, for libellant; John L. Quinlan, New York City, of counsel.

Lord, Day & Lord, New York City, for respondent-petitioner, The Cunard Steam-Ship Company Limited; John F. O'Connell, New York City, of counsel.

Atkins & Weymar, New York City, for respondent-impleaded petitioner, John T. Clark & Son; William Weymar, Jr., Joseph B. McDonald, New York City, of counsel.

Enrico S. Sanfilippo and Keesing & Keesing, New York City, for respondent-impleaded, Penson & Co.; Enrico S. Sanfilippo, John Keesing, New York City, of counsel.

LEVET, District Judge.

This action in admiralty, brought by the libellant, David Crystal, Inc. (Crystal), seeks to recover the value of twenty-eight of its shipment of twenty-nine cases of shirts transported by the respondent, Cunard Steam-Ship Co. (Cunard), pursuant to an ocean bill of lading consigning the goods to Crystal's customs broker in New York, Penson & Company (Penson).

The original libel asserted a cause of action against Cunard for non-delivery of twenty-eight of the twenty-nine cases of shirts. Cunard in its answer denied the material allegations of the libel and asserted the affirmative defenses of limited liability under both The Carriage of Goods by Sea Act, 46 U.S.C. § 1304(5) and the terms of the bill of lading. At the same time Cunard, pursuant to Admiralty Rule 56, impleaded its stevedore, John T. Clark & Son (Clark), seeking "full liability over and indemnity" for alleged breach of its stevedoring and terminal operating contract. Clark answered both Cunard's impleading petition and the libel by denying the principal allegations of both and asserting the affirmative defense of delivery and limited liability. Clark thereafter impleaded the libellant's customs broker Penson, alleging negligence and seeking "full liability over * * * and indemnity." Penson answered both the libel and the impleading petition denying the material allegations in each and asserting as affirmative defenses complete exoneration and limitation of liability resulting from the terms of its contract with the libellant.

It was in this posture that the pleading stood, save for certain amendments by Cunard and Penson, until the completion of the trial, when libellant asked, and was granted, permission to amend its libel to conform to the proof. The resulting amended libel asserted for the first time direct claims against Clark for negligence and Penson for breach of contract and conversion and a second cause of action against Cunard for conversion. Cunard, Clark and Penson all filed exceptions to the amended libel. By memorandum decision, dated June 6, 1963, I overruled the exceptions to the direct claims against

276

Clark and Penson but sustained Cunard's exception to the second cause of action for conversion. The jurisdictional questions raised by the amended libel as well as those raised by the original pleadings were to be determined after submission of further briefs and proposed findings of fact keyed to the testimony and proof.

After hearing the testimony of the parties, examining the exhibits, the pleadings, the briefs and proposed findings of fact and conclusions of law submitted by counsel, this court makes the following Findings of Fact and Conclusions of Law pursuant to Admiralty Rule 46½.

## FINDINGS OF FACT

1. At all times herein pertinent, David Crystal, Inc. was and is a corporation organized and existing under the laws of the State of New York with an office and place of business in the County, State and City of New York.

2. At all times herein pertinent, the respondent-petitioner, Cunard Steam-Ship Co. Ltd., was and still is a corporation organized and existing under the laws of the United Kingdom with its principal place of business in Liverpool, England, and an office and place of business in the City, County and State of New York.

3. At all times herein pertinent, respondent-impleaded petitioner, John T. Clark & Son, was and still is a corporation organized and existing under the laws of the State of New York with an office and place of business in the City, County and State of New York.

4. At all times herein pertinent, respondent-impleaded, Penson & Co., was and is a co-partnership of Harvey Penson, Jack Penson and Louis Penson, doing business under the name Penson & Company, with an office and place of business in the County, State and City of New York.

5. On October 31, 1957 at Le Havre, France, 29 cases of shirts owned by libellant were received in good order and condition by Cunard for shipment, freight prepaid, aboard Cunard's vessel, SS Trelyon.

6. Penson was the named consignee in the bill of lading (Lib. Ex. 1) and was acting as Crystal's customs broker with regard to this shipment. Crystal as owner of the shipment, was the real party in interest, and has standing to bring this action.

7. The 29 cases of shirts were carried by Cunard aboard the SS Trelyon from Le Havre, France, to New York, N. Y., between October 31, 1957 and November 14, 1957.

8. On November 4 or 5, 1957, prior to the arrival of the vessel, Penson received by air mail from the shipper, W. Wingate & Johnson, two original consolidated bills of lading and several copies of the consular and commercial invoices pertaining to this shipment.

9. Upon receipt of these documents, Penson's documents department prepared a folder for this shipment in which were kept all documents pertaining thereto. (Penson Ex. I) Prior to November 14, 1957, Penson prepared the United States Customs Consumption Permit and submitted it, together with a duplicate original bill of lading, to U. S. Customs. After approval by Customs, the duty was paid by Penson and the entry permit was validated on November 12, 1957. The validated entry permit was forwarded by government messenger on November 14, 1957 to U. S. Customs, Pier 2, Bush Terminal.

10. On November 13, 1957, Cunard mailed to Penson a notice that the SS Trelyon would arrive at Pier 2, Bush Terminal, Brooklyn, on November 14, 1957. This notice was received by Penson on November 14, 1957.

11. Penson endorsed one of the duplicate original bills of lading (Lib. Ex. 1) and presented it to Cunard's Inward Freight Department on November 14, 1957.

12. After receiving the endorsed bill of lading, Cunard advised its terminal operator, Clark, by telephone on November 14, 1957 that all freight had been received and that it was in order to release the goods to the consignee, Penson.

upon presentation of Penson's delivery order to Clark.

13. On November 15, 1957, the 29 cases of shirts were discharged from the SS Trelyon in the same good order and condition as shipped and were landed by employees of John T. Clark & Son on the dock at Pier 2, Bush Terminal.

14. Case No. 92 containing 420 shirts was delivered to Public Stores for Customs inspection and the remaining 28 cases were segregated by employees of John T. Clark & Son and kept together on Pier 2, Bush Terminal, Brooklyn, New York, on November 15, 1957.

15. Clark acted as stevedore and terminal operator at Pier 2, Bush Terminal, Brooklyn, pursuant to a written contract with Cunard (Lib. Ex. 4) and undertook to deliver the cargo unloaded from the SS Trelyon to the named consignee in the bill of lading upon receiving advice from Cunard that all freight charges had been paid.

16. On November 14, 1957, after receiving the arrival notice from Cunard and completing clearance of the shipment through Customs, the shipment folder was given to Penson's traffic clerk, Jose Perez, who prepared and signed a delivery order naming Arrow Carriers, one of several trucking firms employed by Penson, as the trucking company to accept delivery of the shirts at the pier. The completed delivery order was to be mailed to Arrow Carriers. As was the custom and practice at Penson, after Perez had signed the delivery order, he marked the shipment folder (Penson Ex. I) to indicate that the delivery order had been mailed on November 14, 1957. He then placed the completed delivery order on the outside of the shipment folder and allowed perhaps five or ten folders to accumulate before placing the delivery orders in the mail basket to await a pick-up by the mail clerk.

Shortly after Perez had signed the delivery order it was surreptitiously taken from Perez' desk by another Penson employee, Louis Segarra, when Perez momentarily stepped away. Segarra also took a blank delivery order and delivered both the original and the blank to one Arthur Schwartz, a former employee of Penson. All of these actions were pursuant to a conspiracy to effectuate a misdelivery of the Crystal shipment in which the co-conspirators were, in addition to Segarra and Schwartz, Andrew Rigley, Salvatore Orlando and Anthony Garite. The only Penson employee among the conspirators was Segarra. In further pursuance of the plan, Schwartz handed the original and blank delivery order to Rigley, who thereupon copied the information from the completed delivery order to the blank form and inserted the name of a fictitious trucking company, C&L Trucking Co., in the place of Arrow Carriers. Another confederate, Orlando, forged Perez' signature to the delivery order. Rigley then destroyed the original. Segarra and Schwartz were given a ring for their participation in the conspiracy.

17. Perez did not physically determine that the order actually was mailed or that the mailroom clerk picked it up. (392, 411) Penson kept no mail book and the only record that the completed delivery order had been sent out was the notation on the shipment folder (Penson Ex. I) which was placed thereon when Perez had signed the delivery order. Perez did not see Segarra take the completed delivery order from his desk and did not discover its absence, or diversion, until November 21, 1957, as he assumed in the normal course of the procedure the delivery order had been picked up by the mail clerk and mailed to Arrow Carriers.

18. Rigley and Orlando obtained a truck from another confederate, Garite, and two days before November 15, 1957, repainted the doors of the truck, thereby obliterating the name "M&S Trucking." At approximately 7:20 A.M. on November 15, Rigley painted on the doors of the truck the name of the fictitious trucking company, "C&L Trucking." The license plates on the truck had previously been stolen. There were no Customs

House marks on the truck and none were required to gain access to the pier.

19. On November 15, 1957, Rigley and Orlando arrived at approximately 7:30 A.M. at Pier 2, Bush Docks, and parked their truck outside the pier. Rigley first went to the pier gateman and obtained a pier pass listing the name and license plate number of his truck. (Clark Ex. B) No request was made by the gateman to see the registration for the truck. Rigley then went to the chief delivery clerk, William Keane, a Clark employee, and presented the forged delivery order. The delivery clerk marked the delivery order with an order number and compared the bill of lading number on the delivery order with that in the delivery book to ascertain whether the freight had been paid. The delivery book, composed from a duplicate manifest given Clark by Cunard prior to the arrival of the vessel, listed all of the ship's cargo. He then checked the consignee and the type of Customs permit involved. Satisfied that all was in order, he entered in the delivery book the name of the truckman and the number of packages he was to pick up. (Cunard Ex. C) The delivery clerk then attached the gate pass to the delivery order and handed it to Rigley to present to the U. S. Customs representative on the pier. The Customs representative checked that all was in order and placed the customs stamp on the delivery order and indicated that case No. 92 was to be placed in public stores. Rigley then took the delivery order and gate pass to the dock boss, who assigned a checker, Albert Scarabino, and gave him the delivery order and the gate pass. Scarabino first checked to determine whether the license plate number on the gate pass coincided with that on Rigley's truck. Determining that it did, at approximately 3:30 or 4:00 P.M., the 28 cases of shirts were loaded aboard the truck by stevedores and tallied by Scarabino. After completing his tally, Scarabino signed the gate pass, the tally sheet (Clark Ex. A) and the reverse side of the delivery order (Lib. Ex. 5) and returned them to Rigley. Rigley then returned to the U. S. Customs representative, who stamped the original tally sheet and returned it to him and retained the duplicate. Rigley then returned to the chief delivery clerk, Keane, and surrendered the tally sheet, delivery order and gate pass. Keane then posted the date, the truck number and the number of cases delivered in the delivery book alongside the bill of lading number. Rigley's accomplice, Orlando, signed the delivery book with a fictitious name, acknowledging receipt of the cargo. An assistant delivery clerk made out a loading ticket, a copy of which, together with the gate pass, was given to Rigley, who surrendered them to the gateman as he left the pier. The shirts were then sold by the thieves to a "fence."

20. No one at the pier asked Rigley for personal identification nor did anyone question the newly painted doors of the truck or the even more recently painted lettering.

21. Prior to November 15, 1957, Keane had not heard of C&L Trucking, although he was familiar with the names of many of the trucking companies which regularly called at the piers. In the past he had, but very seldom, questioned trucks at the pier with which he was not familiar. (211–12) November 15, 1957 was the first time Keane had ever seen a delivery order naming C&L Trucking, but he made no inquiry or check of any kind.

22. Keane could not read the signature on the delivery order (Lib. Ex. 5) and he made no attempt to verify it. He was given no instructions by Clark as to what to do if he was unable to read the signature.

23. It was the practice in 1957, if a question arose concerning the delivery order, to call the customs broker. Keane did not call in this instance.

24. Prior to the time when the 28 cases of shirts left Pier 2, Bush Terminal, John T. Clark & Son's delivery clerk ascertained from the permit issued by U. S. Customs that Penson & Company's representative was a proper party to accept delivery of the shirts.

25. The gate pass (Clark Ex. B), given by Rigley to Scarabino, the checker, bore the printed notation:

"Gate Pass

"Pier 25, N.Y.D., Brooklyn"

There is no evidence to show that this was a forgery or that this gate pass was not the one given to Rigley by the Pier 2, Bush Terminal gateman. Similarly, the tally sheet (Clark Ex. A) contained the printed notation:

"Piers 92, 90, North River"

The evidence shows that in spite of its printed notation, this tally sheet was the one used at this pier, for this vessel, on this date, and was in fact signed by Scarabino.

26. Neither Penson nor Crystal ever received the 28 cases of shirts.

27. All persons on the pier with whom Rigley dealt were employees of Clark with the exception of the gateman and the Customs representative.

28. On November 19, 1957, Harvey Penson received a call from Crystal that the goods had not yet been delivered. On the same day, Perez, at H. Penson's direction, called Arrow Carriers to inquire and was informed they had not as yet received the delivery order and bills of lading. They requested a duplicate set of inland bills of lading and delivery orders be sent to them. The duplicate set of papers was delivered by hand on November 19, 1957. On November 21, 1957, Crystal called again, saying that they had not yet received the shipment. Perez then called the pier and was told the shipment had been delivered to C&L Trucking Co. On November 21, 1957, H. Penson and Perez went to the pier and examined the signatures on the delivery order (Lib. Ex. 5) and in the delivery book (Cunard Ex. C). Perez examined the delivery order (Lib. Ex. 5) but did not immediately recognize that the signature on the delivery order was not his and it was not until he examined it closely and saw the substitution of C&L Trucking for Arrow Carriers that he discovered it was a forgery. (408)

29. Clark never requested, nor did Penson ever file with Clark, either a list of its partners or employees authorized to sign delivery orders or truckmen authorized by Penson to take delivery in its behalf.

30. It was not customary for customs brokers to file signature cards of persons authorized to sign delivery orders (201) or a list of truckers authorized to receive cargo in their behalf. Similarly, it was not customary for terminal operators, such as Clark, to maintain a list of authorized signatures of freight forwarders or a list of approved trucking companies hired by freight forwarders or consignees. In Keane's experience since 1919, several firms had filed signature cards, but none had done so within the recent past.

31. It was a customary practice at Penson for all employees to have access to the shipment folders, even when on the desk of the traffic clerk Perez and after a delivery order had been signed. Should the folder be removed with Perez' permission after the delivery order had been signed, Perez personally saw to it that the completed delivery order was mailed that day. All delivery orders signed on any day were either mailed or were called for by the truckers and none were allowed to remain overnight.

32. Blank delivery orders were unnumbered and were available in pad form to all employees, including Segarra, whose duties included signing delivery orders on shipments other than commercial shipments such as that involved here.

33. Prior to employing Segarra, Penson investigated his background, although no inquiry was made of Segarra's prior employment by a competitor customs broker, as it was a general practice in the trade not to inquire of former customs-broker employers since favorable reports on former employees were not given as a matter of practice. Prior to November 1957, Segarra had been in Penson's employ approximately two or three years and there was no reason to suspect him of any improper conduct

and he had handled valuable shipments prior to this incident. None of the employees were bonded.

34. In 1957, approximately twelve people at Penson were authorized to sign delivery orders. No notice was given to the pier when such an employee left Penson's employ.

35. In 1957, Penson employed approximately five or six different over-the-road trucking firms.

36. Since 1960, Penson has employed an impression seal on their delivery orders and has informed the steamship companies and the stevedores not to honor any Penson delivery orders which do not have Penson's impression seal on them.

37. It was not customary at any of the piers for the pier personnel to require personal identification of the driver or to ask to see the registration for the truck.

38. The contract between Clark and Cunard provided:

"The Contractor [Clark] shall:

* * *

"(ii) Provide efficient clerking and checking services both in respect to the receiving of cargo for loading and the delivery of cargo after discharge.

* * *

"(xxv) As terminal employees, engaged in clerical services of tallying and delivery of cargo, are selected so far as possible according to their integrity and ability, the Contractor cannot assume responsibility for losses resulting from possible theft or errors in delivery or receiving of cargo except where fraud on the part of those employees is clearly evident. However, the Contractor will indemnify and save harmless Agent [Cunard] against any and all cargo claims caused by theft or pilferage when such cargo is placed in the permanent pier cribs in the care, custody and control of the Contractor, and/or the care, custody and con-

trol of any protective organization engaged by Agent * * *." (Lib. Ex. 4)

39. The bill of lading pertaining to this shipment contained the following clauses:

" * * * PACKAGE(S) MERCHANDISE to be delivered, day or night, subject to the exceptions, restrictions and conditions of the undermentioned clauses, from the Ship's Deck where the Shipowner's responsibility shall cease, in the like good order and condition at the Port of New York. * * *

"The Goods to be received by the consignees immediately the vessel is ready to discharge or otherwise they may be landed on the wharf or quay or at the option of the Master or the Ship's Agent they will be landed and stored at the sole expense and risk of Consignee in the Warehouses provided for that purpose, or in the Public Store, as the Collector for the Port of Discharge shall direct, and when deposited in the Public Store to be subject to rent; and the keys of the Warehouse to be delivered to and kept in charge of the Officer of Customs under the direction of the Collector, the Collector of the Port being hereby authorized to grant a general order for discharging immediately after the entry of the ship.'"

"The Act of God * * * Thieves * * * Pilferage * * * always excepted. * * *

"Notwithstanding anything to the contrary contained in this Bill of Lading it is mutually agreed that the carrier is not liable in any case for more than the consular or foreign invoice value and that the value of each package shipped hereunder does not exceed £ 20 or its equivalent in American Currency on which basis the freight is adjusted, and the carrier's liability shall in no case exceed that sum per package or relatively for any proportion thereof, unless a value in excess thereof and true na-

ture thereof be specially declared and stated herein and extra freight as may be agreed on paid \* \* \*." (Lib. Ex. 1)

40. Penson in its procedure on this shipment followed its own established procedure and the customary procedure for customs brokers in the handling of inward shipments.

41. The procedure followed by Cunard in respect to this shipment is the procedure customarily followed by carriers in allowing the stevedore to unload and deliver inward shipments in the shipping industry.

42. The procedure followed by Clark with respect to this shipment is the procedure customarily followed by the stevedoring industry.

## DISCUSSION

A single sentence suffices to express the essential facts in this case: The cargo in question was discharged from Cunard's vessel to the pier by Clark, the stevedore, and from there misdelivered by Clark upon the presentation of a forged delivery order of the customs broker, Penson, obtained by the thieves through the complicity of one of Penson's employees. While pilferage on the New York docks is not new, the cool assurance with which the conspirators completed the necessary formalities and waited at the pier almost nine hours until the cargo was finally loaded aboard their truck, gives some indication that this was a masterly executed plot to obtain the cargo by persons more than casually familiar with the procedures of the piers and the customs brokers. The question for this court is, who, among the four parties involved, bears the brunt of that loss.

### I.

At the outset is the question of Cunard's liability. It was undisputed at the trial that the misdelivery occurred after the cargo had been discharged from the vessel in the same good order and condition, segregated on the pier by the stevedore, and notice given to

the consignee of the time and place of the delivery.

The bill of lading provides:

"Packages merchandise to be delivered subject to the exceptions, restrictions and conditions of the undermentioned clauses, from the ship's deck where the Shipowner's responsibility shall cease \* \* \*.

\* \* \*

"The Goods to be received by the consignees immediately the vessel is ready to discharge or otherwise they may be landed on the wharf or quay or at the option of the Master or the Ship's Agent they will be landed and stored at the sole expense and risk of Consignee in the warehouses provided for that purpose \* \* \*."

■■ Were a literal reading of the bill of lading permitted, the case would clearly come to a swift end in favor of the carrier. But so easy a solution is not possible. Notwithstanding its own terms, the bill of lading was potentially subject to overriding statutory provisions of the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1300 et seq, and the Harter Act, 46 U.S.C. § 190 et seq. The first question then is whether the provisions of the bill of lading are to be altered by the force of statute.

As the cargo had been discharged from the ship, the terms of the bill of lading were no longer subject to COGSA, whose coverage is statutorily defined to embrace the period, in foreign commerce, "from the time when the goods are loaded on to the time when they are discharged from the ship." 46 U.S.C. § 1301(e). Similarly, the bill of lading was no longer subject to the Harter Act, 46 U.S.C. § 190, which is applicable to the period between the discharge of the cargo and its "proper delivery." Caterpillar Overseas, S. A. v. S. S. Expeditor, 318 F.2d 720 (2 Cir. 1963); Gilmore & Black, The Law of Admiralty 126 (1957). While the Harter Act contains no statutory definition of the term "proper delivery," the courts have held that, in the

absence of port customs and regulations to the contrary, "proper delivery" constitutes delivery at a fit and customary wharf. Isthmian S. S. Co. v. California Spray-Chemical Corp., 290 F.2d 486 (9 Cir. 1961), affirmance adhered to on rehearing, 300 F.2d 41 (1962); Caterpillar Overseas, S. A. v. S. S. Expeditor, supra; Tan Hi v. United States, 94 F.Supp. 432 (N.D.Cal.1950). No contrary port custom or regulation was established in this case and, by its own terms, the contract of affreightment expressed in the bill of lading came to an end when the goods were discharged onto the pier, segregated by the stevedore, and notice given to the consignee of the time and place of delivery. Cf. Constable v. National S. S. Co., 154 U.S. 51, 14 S.Ct. 1062, 38 L.Ed. 903 (1894); The Eddy, 5 Wall. 481, 18 L.Ed. 486 (1886); The Titania, 131 F. 229 (2 Cir. 1904). And thereafter, "[u]ntil receipt by the consignee, the carrier, despite any terms to the contrary in its bill of lading, continues to hold goods unloaded by it as a bailee. Or, as some cases have put it, where, by the terms of the bill of lading, the contract of carriage terminates on discharge of the cargo from the ship, its liability changes from that of a common carrier to that of a warehouseman, * * *." Standard Brands Inc. v. Nippon Yusen Kaisha, 42 F.Supp. 43, 44 (D.Mass.1941). See also, The Italia, 187 F. 113 (2 Cir. 1911).

## II.

■ At the time the goods were delivered to the impostors, Cunard was no longer in physical possession of them, having chosen, without notice to the consignee, to allow Clark, its stevedore, to come into physical possession of the cargo and to serve in Cunard's stead. As was stipulated at the trial, Clark undertook to deliver the cargo unloaded from the SS Trelyon to the named consignee in the bill of lading upon receiving advice from Cunard that all freight charges had been paid. The stevedore was "an agent selected by the carrier to carry out the carrier's obligation to safely deliver and discharge the cargo as required by its contract with the shipper." A. M. Collins & Co. v. Panama R. Co., 197 F.2d 893, 896 (5 Cir. 1952). Cf. The Ben Adams, 3 Fed.Cas. 155 (No. 1289) (D.C.S.D.N.Y.1868), where a clerk hired by the carrier misdelivered the cargo.

Cunard argues that Clark is an independent contractor and that it is not vicariously liable for Clark's actions under the circumstances in this case. It relies primarily on two cases, The Satilla, 235 F. 58 (2 Cir. 1916) and The Teno, 47 F.2d 197 (2 Cir. 1931). The crucial distinction between those cases and the present situation is that here a bailment is involved and "the rule is well settled that a bailee for hire is responsible for the proper care, not only by himself but by anyone to whom he entrusts it and it makes no difference whether that other is an independent contractor or not." Taylor v. United States, 66 F.Supp. 231, 233 (E.D.Pa. 1946). Accordingly, Cunard stands vicariously liable for the actions of Clark and whatever standard of care is imposed upon Cunard, after its contract of affreightment came to an end, devolves upon Clark.

## III.

Cunard's liability as a carrier had ceased and both it and its agent Clark stood as warehouseman in relation to the cargo. The question becomes, what is the liability of a carrier, as warehouseman, for a delivery of the goods to the wrong person.

The libellant argues that a warehouseman is absolutely liable for a misdelivery without any question as to his negligence, relying in the main on New York cases. Cunard and Clark argue that as Cunard's liability as carrier had ceased, their duty thereafter was only to exercise ordinary care for the protection of the goods and they are not liable for misdelivery in the absence of proof that they were negligent. The respondents rely upon such cases as The Bellingham, 57 F.2d 1015 (3 Cir. 1932) and North Amer. Smelting

Co. v. Moller S.S. Co., 204 F.2d 384 (3 Cir. 1953). These cases, and many more, unquestionably stand for the proposition that the duty of a carrier, as warehouseman, is to exercise ordinary care for the protection of the goods. However, in none of these cases, was a *misdelivery* involved. The goods in question here were lost by reason of a misdelivery, and not by reason of a theft or burglary. While the law in the admiralty is clear that a warehouseman's liability for property stolen or lost through fire or some misadventure other than misdelivery is only for negligence, North Amer. Smelting Co. v. Moller S.S. Co., supra (theft); Standard Brands Inc. v. Nippon Yusen Kaisha, supra, and The Italia, supra (cargo damage by water), there is no direct precedent in admiralty establishing the standard by which a carrier, as warehouseman, is to be judged for a misdelivery of cargo after the termination of the contract of carriage. The lecuna is somewhat surprising. The court has been able to find only two reported cases in admiralty discussing the liability of a carrier as warehouseman for misdelivery after the contract of carriage terminated, and in each the standard is by no means clear. These are MacAndrews & Forbes Co. v. United States, 23 F.2d 667 (3 Cir. 1928) and Julius Klugman's Sons, Inc. v. United States Lines Operators, Inc., 1935 AMC 1514 (S.D.N.Y.1935).[1]

In MacAndrews, suit was brought against the ocean carrier to recover the value of certain fox skins which respondent's vessel failed to deliver to the consignees in New York. The consignees employed a customs broker to arrange for entry of the shipment and delivery to them. The customs broker hired a trucking firm, and gave the firm a signed delivery order directing the carrier to deliver the goods to the truckman. The trucker left the delivery order in an unlocked drawer of a desk in a public garage where it was to await a pick-up by the firm's driver. A thief abstracted the delivery order and presented the stolen order to the carrier's delivery clerk and received and made off with the goods. The court held the carrier not negligent in honoring the valid delivery order presented by the thief, that the negligence was upon the libellant's agent, and as between the innocent carrier and consignee, the loss should fall on the latter. The case of Julius Klugman involved the theft of the cargo from the pier by means of an altered or incorrect gate pass. The court held, "It is clearly established that as a result of negligence, if not worse, on the part of employees of both United [pier owner] and Jarka [stevedore], a thieving truckman was able to enter the gate, obtain possession of the furs, pass checkers, the delivery clerk and the watchman, pass through the gate again, and drive away with the furs." 1935 AMC at 1519.

The only other authority in admiralty which the court has been able to find is a statement in The Santee, 21 Fed.Cas. 411 (No. 12,328) (D.C.S.D.N.Y.1868), aff'd 21 Fed.Cas. 414 (No. 12,330) (C.C.S.D.N.Y.1870) to the effect that the carrier, after termination of the contract of carriage, remains "responsible for the value of the goods if he delivers them to the wrong person, even though by mistake or imposition," although the case itself was decided on another ground. In addition, there are two cases in the New York Court of Appeals where, in applying maritime law, an ocean carrier was held liable for a negligent delivery, Collins v. Burns, 63 N.Y. 1 (1875) and Tarbell v. Royal Exchange Shipping Co., 110 N.Y. 170, 17 N.E. 721 (1888).

---

1. There is possibly a third case, Strohmeyer & Arpe Co. v. American Lines S.S. Corp., not reported either officially or unofficially, but summarized in 1935 AMC 1005 (S.D.N.Y.1935). From that summary the facts appear to be that the goods were stolen from a pier by a conspiracy between the driver of the delivery truck employed by libellant and a receiving clerk employed by respondent. The clerk gave false passes enabling the truckman to leave the pier with some of the cases which he had delivered there. The respondent was held liable.

284

In none of these cases can it fairly be said that the only standard applicable to the carrier as warehouseman is that of reasonable care, for these cases, properly construed, support the proposition that if the carrier, as warehouseman, negligently delivers the goods to the wrong person, it is liable for the loss. On the other hand, the law prevailing on the land is almost uniformly to the effect that a warehouseman is absolutely liable for a misdelivery.

■ It should first be pointed out that New York law is in no wise controlling. The libellant's claim for non-delivery on the ocean contract of affreightment is to be governed by the general maritime law. This would be true even were the jurisdictional basis of the libel other than this court's admiralty jurisdiction. If the maritime law recognizes a claim, it could not be defeated by a contrary New York rule. Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959). However, this does not mean that lacking a clear precedent in admiralty resort to the law prevailing on the land is without benefit. "Maritime law draws on many sources; when there are no clear precedents in the law of the sea, admiralty judges often look to the law prevailing on the land. * * *" Igneri v. Cie. De Transports Oceaniques, 2 Cir., 323 F.2d 257, 1963. If the law prevailing in the states, uniformly or nearly so, were to impose a standard other than reasonable care for misdelivery by a warehouseman, "a United States admiralty court would approach the problem here by asking itself why it should not likewise do so." Igneri, supra.

It was early held in New York that a carrier, as warehouseman, was liable for misdelivery even though the result of an honest mistake on its part. In Bank of Oswego v. Doyle, 91 N.Y. 32 (1883) the plaintiff sought to recover for the non-delivery of a cargo of wheat which the defendants, as common carriers, had transported over water from Toledo to Oswego. The cargo remained aboard the

schooner after mooring and from there, placed, without the plaintiff's consent, in a grain elevator. The defendants argued that their liability as carriers had ceased and that they remained liable as bailees and warehouseman. In rejecting this contention the court said, 91 N.Y. at 42: "Warehouseman are [sic] not only liable for losses occasioned by their negligence, but for those which arise from innocent mistakes in the delivery of goods to persons not entitled to receive them." The same result was had in Security Trust Co. v. Wells, Fargo & Co., 81 App.Div. 426, 80 N.Y.S. 830 (1903), aff'd on the opinion below, 178 N.Y. 620, 70 N.E. 1109 (1904). There, an express company sought to escape liability for misdelivery by claiming the status of warehouseman. In rejecting the contention that the express company stood as warehouseman, the court held, 81 App.Div. at 430, 80 N.Y.S. at 833: "Nor would it benefit the defendant if the liability were that of a warehouseman or of an involuntary bailee, for the wrongdoing consisted in the affirmative act of delivering the goods to a person not the consignee." Similarly, in Strong v. Security Storage & Warehouse Co., 108 Misc. 329, 332, 177 N.Y.S. 591 (Sup.Ct.), aff'd 190 App.Div. 930, 179 N.Y.S. 953 (1919), it was held:

"'A warehouseman is liable for conversion of property stored, if without authority he delivers it, either negligently, intentionally, or by mistake, to one not entitled to it, and he is liable, although the mistake was not due to want of ordinary care and prudence on his part.'"

The law in other states is in complete accord. In Cleveland C. C. & St. L. Ry. v. Wright, 25 Ind.App. 525, 58 N.E. 559 (1900) a railroad which had voluntarily delivered the goods of another to a wrong person, was held liable either as a common carrier or warehouseman for the loss, without regard to the question of negligence. Similarly, in Shank Fireproof Warehouse Co. v. Harlan, 108 Ind. App. 592, 29 N.E.2d 1003, 1005 (1940) the court stated:

"'Indeed, for such delivery to a wrong person, not upon compulsion

by legal process, but voluntarily, though through mistake, either a common carrier or a warehouseman would be responsible as for conversion, without regard to any question of negligence.' "

To the same effect see Terminal Warehouse & Refrig. Co. v. Cross Transp. Co., 33 A.2d 617 (D.C.Mun.Ct.App.1943). For a collection of authorities see 1 Harper & Jones, Torts 156 (1956).

Much of the law in this area is now statutory, being governed either by the Uniform Warehouse Receipts Act (UWRA) or the Uniform Bill of Lading Act (UBLA). UWRA, promulgated by the National Conference on Uniform Laws in 1906, has been enacted in every state, the District of Columbia, the Virgin Islands, Puerto Rico and the Panama Canal Zone, see 3 Uniform Laws Ann. The UBLA, promulgated in 1909, has been enacted in 31 states and has been superseded for interstate shipments and foreign exports by the Federal Bills of Lading Act, 39 Stat. 538 (1916), as amended, 49 U.S.C. §§ 81–124 (1948) which, for the most part, is identical to the UBLA.

Section 10 of UWRA provides:

"Where a warehouseman delivers the goods to one who is not in fact lawfully entitled to the possession of them, the warehouseman shall be liable as for conversion to all having a right of property or possession in the goods if he delivered the goods otherwise than as authorized by subdivisions (b) and (c) of the preceding section and though he delivered the goods as authorized by said subdivisions he shall be so liable, if prior to such delivery he had either:

"(a) Been requested, by or on behalf of the person lawfully entitled to a right of property or possession in the goods, not to make such delivery, or

"(b) Had information that the delivery about to be made was to one not lawfully entitled to the possession of the goods."

Subdivisions (b) and (c) of Section 9 provide:

"(b) A person who is either himself entitled to delivery by the terms of a non-negotiable receipt issued for the goods, or who has written authority from the person so entitled either indorsed upon the receipt or written upon another paper, or

"(c) A person in possession of a negotiable receipt by the terms of which the goods are deliverable to him or order or to bearer, or which has been endorsed to him or in blank by the person to whom delivery was promised by the terms of the receipt or by his mediate or immediate indorsee."

Similar provisions are contained in Section 13 of UBLA and Section 10 of the Federal Bill of Lading Act.

Under these uniform acts, a carrier or warehouseman has been held absolutely liable for delivery to the wrong person, even where, as here, the bailee relied upon a skillfully forged delivery order. Thus, in Adel Precision Prod. Corp. v. Grand Trunk W. R. R., 332 Mich. 519, 51 N.W.2d 922, cert. denied 344 U.S. 831, 73 S.Ct. 38, 97 L.Ed. 647 (1952), a carrier was held liable under the Federal Bill of Lading Act although he made delivery on a forged indorsement on the bill of lading. Similarly, in Freedman v. George W. Bush & Sons Co., 284 Pa. 16, 130 A. 263 (1925), a carrier who delivered on a forged order was held liable, the court stating:

" 'Whatever doubt may hang over other questions as to the termination of a carrier's or other bailee's responsibility, there is one point which is indisputable, that he must take care at his peril that the goods are delivered to the right person, for a delivery to a wrong person renders him clearly responsible * * * though innocently and by mistake, as when it is made upon a forged order.' "

The same result would follow under Article 7 of the Uniform Commercial Code,

which has been adopted in 18 states, see 1 Anderson, Uniform Commercial Code vii (1961) and 1962 Supp. As Professor Braucher of Harvard states, "Delivery to the wrong person, under the Code as under prior law, would seem to subject the bailee to an absolute liability to the person entitled under the document, even though, for example, the bailee relied on a skillfully forged delivery order." Braucher, Documents of Title Under the Uniform Commercial Code 32 (1958).

There is, however, an important caveat which prevents the strict application of these uniform acts to the case at bar. The delivery order of Penson upon which Clark made delivery is certainly not a warehouse receipt as that term is defined in Section 2 of UWRA or Section 1–201 (45) of the UCC. Similarly, the delivery order is not a bill of lading under either Act. While delivery orders, dock warrants and dock receipts were not covered under either UWRA or UBLA, the Uniform Commercial Code expressly includes them.

Section 1–201(15) defines document of title as including "bill of lading, dock warrant, dock receipt, warehouse receipt or order for the delivery of goods, and also any other document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers. To be a document of title a document must purport to be issued by or addressed to a bailee and purport to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass." It is extremely doubtful that Lib. Ex. 5, the forged delivery order, would be a document of title as defined since it can hardly be said of it that "in the regular course of business or financing [it] is treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers."

Perhaps the rule which is most appropriate to be adopted as the general

maritime law is that stated in Restatement, Torts § 234 (1934):

"A bailee who delivers a chattel to one not entitled to its immediate possession is liable to the bailor for a conversion of the chattel, unless

"(a) the bailor has given the bailee reason to believe that the person to whom the chattel is delivered is entitled thereto, or

"(b) the bailee is otherwise privileged to make the delivery."

As comment (b) makes clear, the rule applies to carriers and warehousemen and, as expressed in comment (e), with but a minor exception not relevant here, the rule is that prevailing under the UBLA and UWRA. The rule makes a bailee liable who, through mistake or otherwise, delivers a chattel to a person not entitled to receive it, unless the bailee has been directed to deliver it to such person by his bailor or unless his mistake as to the person entitled to receive the chattel has been induced by the bailor. The requirement that the bailee is relieved from liability where the mistake was induced by the bailor accords with both admiralty and the law of the states and is often spoken of as estoppel by negligence. See MacAndrews & Forbes Co. v. United States, 23 F.2d 667 (3 Cir. 1928); Salomon Stern, Ltd. v. Davis, 292 F. 221 (S.D.N.Y.1923); Terminal Warehouse & Refrigeration Co. v. Cross Transp. Co., 33 A.2d 617 (D.C. Mun.Ct.App.1943); Kramer v. Haeger Storage Warehouse Co., 123 App.Div. 316, 108 N.Y.S. 1 (1908); Phillipson & Co. v. Grand Trunk W. Ry., 238 Ill.App. 251 (1925).

In the face of this overwhelming weight of authority and the lack of a clear precedent in admiralty, the question becomes whether a United States admiralty court should not do as all on land have done. No adequate reason appears why the rule in admiralty concerning the misdelivery by a carrier, as warehouseman, should not be that stated in the Restatement, the UWRA, the

UBLA and the UCC. The necessity of uniformity and the dictates of the certainty of commercial transactions permit no other result. "Certainty in the law governing commercial transactions of this kind is an overriding consideration \* \* \*." Dixilyn Drilling Corp. v. Crescent Towing & Salvage Co., 372 U.S. 697, 698, 83 S.Ct. 967, 10 L.Ed.2d 78 (1963) (Harlan, J. dissenting). The vitalness of the storage and shipment of billions of dollars of merchandise through United States ports annually requires that no distinction exist between the law on the docks and that on the land. The law governing this case is that expressed in the Restatement, Torts § 234 (1934), which itself embodies the modern thought on the subject as set forth in the uniform acts.

## IV.

■ There is no question that Clark as Cunard's agent misdelivered the cargo. The question under the rule just adopted is whether that mistake was induced by the libellant or those acting in its behalf. Crystal itself was guilty of no act or conduct which would bar it from recovery and argues that it cannot be held responsible for the acts of Penson. Penson was acting as Crystal's customs broker with respect to the shipment. Any contention by Crystal that it should not be held responsible for Penson's action is effectively disposed of by the MacAndrews case, supra. There, the libellant employed a firm of custom house brokers to arrange for entry of the shipment and delivery to them. The court found the brokers negligent, thus barring a recovery to the libellant, stating: "In that regard we are clear, as was the court below, that the fraud was made possible by those acting for the plaintiffs." 23 F.2d at 667. See also Salomon Stern, supra. Unquestionably, Crystal stands responsible for the acts of Penson.

■ If Penson were to be found to have induced Clark's mistake, it would be a complete bar to any recovery by the libellant. There is no rule in cargo damage cases which requires the damages to

be either equally apportioned among the parties negligent as in mutual fault collision cases, The Catharine, 58 U.S. 170, 17 How. 170, 15 L.Ed. 233 (1854), but see N. M. Paterson & Sons, Ltd. v. Chicago, 209 F.Supp. 576 (E.D.Ill.1962) or to be proportioned among the parties at fault as in maritime personal injury cases, The Max Morris, 137 U.S. 1, 11 S.Ct. 29, 34 L.Ed. 586 (1890). In cargo damage cases, there is "no rule of law which would permit a determination of liability upon the basis of the calculation of a certain percentage of due care or the calculation of non-exercise of due care, percentage-wise." Tri-Valley Packing Ass'n v. States Marine Corp., 310 F.2d 891, 892 (9 Cir. 1962).

■ The question then narrows itself as to whether any of Penson's acts gave Clark reason to believe that the delivery was proper. It was unquestioned that Segarra, one of Penson's employees, was engaged in a criminal conspiracy to effectuate the theft of the cargo. Much was bruited about at the trial and in the briefs about the practices of Penson in failing to secure the completed delivery orders and the method of permitting truckers to come into the office to pick up completed delivery orders. Even assuming, without deciding that Penson was negligent in this respect, it is difficult to see how this could have been the proximate cause of the loss. Segarra as an employee would have had access to most of the office, even had the delivery orders been secured. There is nothing to indicate that Segarra's abstraction of the original delivery order could have been prevented by reasonable office procedures and whatever negligence there may have been in the procedure did not result in the loss in question.

There is nothing in the record to indicate that Penson was in any way negligent in either initially hiring Segarra or retaining him in its employ. Prior to the theft in question, he had given no indication as to his criminal propensity. "An employer is not bound to assume that an employee, whom he has no reason to suspect of dishonesty, will or may commit

a crime. On the contrary, the presumption is that he will do right and not wrong." Ehrich v. Guaranty Trust Co., 194 App.Div. 658, 664, 186 N.Y.S. 103, 107 (1921), aff'd 233 N.Y. 637, 135 N.E. 950 (1922).

The real issue is whether Segarra's acts were within the scope of his employment. Segarra's duties in 1957 included the signing of delivery orders on in bond shipments, but not on commercial shipments such as that involved here. His duties also included the giving of completed delivery orders to truckers who came to call for them at Penson's office. While the question is not without some doubt, it would appear that Segarra's acts were outside the scope of his employment. In Gleason v. Seaboard Air Line Ry., 278 U.S. 349, 49 S.Ct. 161, 73 L.Ed. 415 (1929), an employee, authorized by his duties to give notice of arrival of shipments, falsely notified the plaintiff, for his own benefit in the successful pursuance of a scheme to defraud, that a shipment had arrived. In reliance on this false information, the plaintiff expended funds which later he sought to recover. The Supreme Court held the employer railroad liable, holding that "the liability of the principal for the false statement or other misconduct of the agent acting within the scope of his authority is unaffected by his secret purpose or motives." 278 U.S. at 356, 49 S.Ct. at 162, 73 L.Ed. 415. The crucial distinction between the Gleason case and the present situation is that Segarra had no authority to sign delivery orders in commercial shipments, such as the one in question here. If he had, the Gleason case would unquestionably be controlling. The mere fact that Segarra was acting for his own corrupt purposes does not place the act outside his employment. See Restatement (Second), Agency § 236 (1958). What is controlling is that his act of abstracting the valid delivery order from Perez' desk was not within the scope of his employment.

Furthermore, the document which Segarra abstracted was not the one used to obtain delivery. It is unquestioned that Clark made delivery on a forged order. The blank which Segarra also abstracted was, beyond doubt, an incomplete instrument. Only the intervening criminality of the co-conspirators gave some life, albeit abortive, to the document. In Ehrich v. Guaranty Trust Co., supra, the defendant was the transfer agent of a corporation and in that capacity held certificate books which had been signed by the corporate officers but which required the countersignature of the transfer agent to be valid. The defendant employed a clerk whose previous history showed no criminal propensity. The clerk, while working alone at night, abstracted ten certificates from the books, forged the defendant's signature and used them as collateral with the plaintiff in a trading account. Several years later, when the forgeries were discovered, the plaintiff sought to recover his loss from the defendant. The court found that the defendant had not been negligent, holding, 194 App.Div. at 661, 186 N.Y.S. at 105:

> "These forged certificates, when taken from the certificate book by Goodwin, were not complete instruments. They had been sealed by the gas light company and signed by its proper officers. To make them completed instruments they still required the signatures of the transfer agent and the registrar of transfers. They never became completed instruments, as those signatures were never affixed to them. The boy, Goodwin, had not authority to affix those signatures to the certificates, and his act in so doing was a crime."

The invalidity of the delivery order here distinguishes the case at bar from both the MacAndrews and Salomon Stern cases.

■ The libellant is not estopped from asserting its claim for the loss because of any acts by Penson and is entitled to a decree in its favor against the respondent-petitioner. Cunard seeks to limit its liability to $500.00 per package under COSGA or to £20, as set forth in

the bill of lading. Since neither COSGA nor the bill of lading was applicable at the time of the misdelivery, Cunard cannot avail itself of either limitation clause and stands liable for the full value of the libellant's loss. Cf. Olivier Straw Goods Corp. v. Osaka Shosen Kaisha, 47 F.2d 878 (2 Cir.), cert. denied 283 U.S. 856, 51 S.Ct. 648, 75 L.Ed. 1462 (1931); The Bellingham, 49 F.2d 442 (D.N.J.1931), rev'd on other grounds 57 F.2d 1015 (3 Cir. 1932). As it was Clark who actually made the misdelivery, it can hardly be doubted that Clark breached both the express and implied warranties of its stevedoring contract. Cunard is, therefore, entitled to a decree awarding it indemnification from Clark under Admiralty Rule 56.

## V.

In view of the foregoing there is no need to consider the direct claim of Crystal against Clark. There remain, however, the claims against Penson asserted in Clark's impleading petition and in Crystal's amended libel. Penson was originally brought into this suit by Clark's impleading petition pursuant to Admiralty Rule 56. Crystal asserted no direct claim against Penson until after the trial when it filed its amended libel. When exceptions and exceptive allegations were taken against the amended libel, the court, as is its duty, Mansfield, C. & L. M. Ry. v. Swan, 111 U.S. 379, 4 S.Ct. 510, 28 L.Ed. 462 (1884), questioned the jurisdictional basis of the direct claim against Penson as well as that of Clark's impleading petition.[2] At that time, decision on these jurisdictional questions was reserved and the parties, at the court's request, have briefed the issues in their post-trial memoranda.

It is black letter law in this circuit that an impleading petition under Admiralty Rule 56 must present at least

federal, and possibly also admiralty jurisdiction over the impleaded party regardless of whether the impleaded party is asserted to be directly liable to the libellant or whether liability over is claimed. The Lake Galera, 60 F.2d 876 (2 Cir. 1932), cert. denied sub nom. Jamison v. United States, 287 U.S. 670, 53 S.Ct. 314, 77 L.Ed. 578 (1933); Aktieselskabet Fido v. Lloyd Brasiliero, 283 F. 62 (2 Cir.), cert. denied 260 U.S. 737, 43 S.Ct. 97, 67 L.Ed. 489 (1922); The Goyaz, 281 F. 259 (S.D.N.Y.1922), aff'd 3 F.2d 533 (2 Cir. 1924), cert. denied 267 U.S. 594, 45 S.Ct. 230, 69 L.Ed. 804 (1925); Rudy-Patrick Seed Co. v. Kokusai Kisen Kabushiki Kaisha, 1 F.Supp. 266 (S.D.N.Y.1932). Cf. Soderberg v. Atlantic Lighterage Corp., 19 F.2d 286, 287 (2 Cir.), cert. denied 275 U.S. 542, 48 S.Ct. 37, 72 L.Ed. 416 (1927). The rule is best expressed in 3 Moore, Federal Practice ¶ 14.25 at 491 (2 ed. 1948):

> "In admiralty, the rule has been that the impleading petitioner should set forth either (a) a cause of action at least within federal (and possibly also within admiralty) jurisdiction between the impleaded party and the libellant, or (b) a claim for indemnity against the impleaded party and in favor of the petitioner which comes at least within federal (and possibly also within admiralty) jurisdiction. * * "

Clark's claims against Penson cannot be premised on diversity of citizenship. 28 U.S.C. § 1332. Clark is a New York corporation. Penson is a partnership composed of Jack Penson, Harvey Penson and Louis Penson. For purposes of diversity of citizenship, a partnership has the citizenship of the individual partners. Great Southern Fire Proof Hotel Co. v. Jones, 177 U.S. 449, 20 S.Ct. 690, 44 L.Ed. 842 (1900);

2. No jurisdictional questions seem to be presented by either the libel against Cunard, The Eddy, 5 Wall. 481, 18 L.Ed. 486 (1886), North Amer. Smelting Co. v. Moller S.S. Co., 204 F.2d 384 (3 Cir. 1953), or Cunard's impleading petition against Clark based on the allegation of

Clark's breach of its stevedoring contract, concededly a maritime contract, American Stevedores Inc. v. Porello, 330 U.S. 446, 67 S.Ct. 847, 91 L.Ed. 1011 (1947). In any event, both could be supported by diversity of citizenship, 28 U.S.C. § 1332.

Grant County Deposit Bank v. McCampbell, 194 F.2d 469 (6 Cir. 1952); Eastern Metals Corp. v. Martin, 191 F.Supp. 245 (S.D.N.Y.1960). There is nothing in the pleadings or the record to indicate the citizenship of the individual partners. The burden to prove jurisdiction is, of course, on the party invoking it, McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936), and for failure to establish diverse citizenship Clark cannot premise its action upon it. In view of the lack of diverse citizenship, there is no necessity to determine whether any basis of federal jurisdiction will suffice under Admiralty Rule 56. "It is not necessary here to determine whether the District Court could introduce such a controversy, though it was not of admiralty jurisdiction, if it was within some one of its other grants of jurisdiction." Soderberg v. Atlantic Lighterage Corp., 19 F.2d 286, 287 (2 Cir.), cert. denied 275 U.S. 542, 48 S.Ct. 37, 72 L.Ed. 416 (1927) (L. Hand, J.).

Since Clark's impleading petition seeks "full liability over * * * and indemnity," the issue narrows itself to whether Clark's claim of indemnity based on "fault, carelessness, negligence and breach of [Penson's] obligations and duties" is cognizable in admiralty. The basis of the claim would seem to be that Penson by its actions committed a maritime tort.

■ The critical factor in determining whether a tort claim comes within the statutory grant of admiralty jurisdiction is the situs of the tort, i. e., the place where it happened.[3] If the tort occurred on navigable waters, the claim is one that lies within the jurisdiction of the court of admiralty. Weinstein v. Eastern Airlines, Inc., 316 F.2d 758 (3 Cir. 1963), petition for cert. filed, 32 U.S.L.Week 3047 (U.S. July 16, 1963) (No. 276). In applying the "locality" test for admiralty jurisdiction, the tort is deemed to occur, not where the wrongful act or omission has its inception, but where the impact of the act or omission produces such injury as to give rise to a cause of action. The Plymouth, 3 Wall. 20, 18 L.Ed. 125 (1865). Whatever acts of Penson constituted "fault, carelessness, negligence and breach of its obligations and duties," unquestionably occurred in the offices of Penson & Co., 11 Broadway. But even assuming Penson's actions had their impact on the pier from which delivery was made, this would still be insufficient. LiMandri v. Lloyd Brasileiro, 316 F.2d 3 (2 Cir. 1963); The Czechoslovakia Victory, 76 F.Supp. 808 (S.D.N.Y.1948). But compare Marubeni-Iida (America) Inc. v. Nippon Yusen Kaisha, 207 F.Supp. 418 (S.D.N.Y.1962).[4] The fact that the cargo which is the subject of the alleged negligence was at some time shipped by a carrier over navigable waters is insufficient to confer admiralty jurisdiction. Schoening v. 102 Jute Bags, 132 F.Supp. 561 (E.D.Pa.1955). In sum, the requisite jurisdiction for Clark's impleading petition cannot here be premised on a maritime tort.

■ Clark urges that admiralty jurisdiction over Penson can be founded on the fact that Penson was the named consignee in a bill of lading, concededly a maritime contract. There is no question but that the bill of lading is a maritime contract, that a suit for its breach is

3. The test is very different from that applicable in respect to contract claims. "In determining whether a contract be of maritime nature, locality is not controlling, since the true test is the subject-matter of the contract—the nature and character of the work to be done. * * * In torts the rule is different. There, jurisdiction depends solely upon the place where the tort was committed. * * *" State Industrial Comm'n of State of New York v. Nordenholt Co., 259 U.S. 263, 271, 42 S.Ct. 473, 474, 66 L.Ed. 933 (1922).

4. No successful contention can be based on the Extension of Admiralty Jurisdiction Act, 46 U.S.C. § 740, for the test under that statute is whether "the impact * * * is felt ashore at a time and place not remote from the wrongful act." Gutierrez v. Waterman S.S. Corp., 373 U.S. 206, 210, 83 S.Ct. 1185, 1188, 10 L.Ed.2d 297 (1963).

clearly within admiralty jurisdiction, New Jersey Steam Navigation Co. v. Merchant's Bank, 6 How. 344, 12 L.Ed. 465 (1848), and as named consignee Penson could have brought this suit, Aunt Jemima Mills Co. v. Lloyd Royal Belge, 34 F.2d 120 (2 Cir. 1929). But the cause of action asserted by Clark is not premised on the bill of lading and it seems beyond question that in order for jurisdiction to be invoked on this basis, the bill of lading must be its bedrock. In Armstrong Cork Co. v. Farrell Line, Inc., 81 F.Supp. 848 (E.D.Pa.1948) suit was brought in admiralty for damage suffered by goods on land merely because they were held under a "dock receipt," a maritime contract. The court held that the obligations owed the cargo while on the dock were separable from the maritime obligations evidenced by the dock receipt and declined jurisdiction. The fact that Penson here was the named consignee in the bill of lading is not so talismanic as to invoke admiralty jurisdiction over Penson for every cause of action involving in some measure the consignee and the shipment.

█ Lastly, Clark contends that lacking independent grounds of admiralty jurisdiction, nonetheless, the court may adjudicate Penson's liability under the doctrine of ancillary jurisdiction. Simply stated, that doctrine holds that when federal jurisdiction over the subpect matter of the main action once attaches, the court has ancillary jurisdiction to decide a third party dispute growing out of the same core of facts even though the third party claim, separately considered, is lacking in the attributes of federal jurisdiction. Dery v. Wyer, 265 F.2d 804 (2 Cir. 1959).[5]

█ The development of the doctrine of ancillary jurisdiction has centered about Rule 14(a), Fed.R.Civ.P., which permits a defendant to implead a third party who "is or may be liable to him

for all or part of the plaintiff's claim against him." It has uniformly been held that the third-party claim need not provide its own independent basis of jurisdiction, but comes within the court's ancillary jurisdiction. Waylander-Peterson Co. v. Great No. Ry., 201 F.2d 408 (8 Cir. 1953); 1A Barron & Holtzoff, Federal Practice and Procedure § 424 at 650-51 (Rules ed. 1960); 3 Moore Federal Practice ¶ 14.26 at 496 (2 ed. 1948).

█ The parties have not cited any case applying the doctrine to an impleading petition under Admiralty Rule 56. The only case which the court has been able to find in which an admiralty court invoked a concept bearing some resemblance to that of ancillary jurisdiction is Evans v. New York & P. S. S. Co., 163 F. 405 (S.D.N.Y.1906). There suit was brought in admiralty by the consignee against both the carrier and the pier operator for the non-delivery of merchandise discharged from the vessel to the pier. Judge Hough entered a decree against both respondents, with a direction to collect first from the warehousemen and any amount not so paid to be collected from the steamship company.

> "It seems clear that neither the libelant nor the steamship company could have maintained an original suit in admiralty against the Beards [warehousemen], because the negligence resulting in the disappearance of the rubber from the land warehouse did not give rise to a maritime tort, and neither was the contract between shipowner and warehousemen a maritime contract. Having found, however, that the carrier is responsible to the libelant, the former clearly has his remedy over against the warehousemen, and, in order to prevent circuity of action and multiplicity of suits, it would have been, under our practice, competent for the shipowner to have

5. For an extended discussion of the doctrine as developed around the Federal Rules of Civil Procedure, see Fraser, Ancillary Jurisdiction and the Joinder of Claims in the Federal Courts, 33 F.R.D. 27 (1963) and Note, 62 Colum.L.Rev. 1513 (1962).

292

petitioned the warehousemen into this proceeding, and, if this could have been done, no reason appears why the warehousemen may not be proceeded against as an original respondent." 163 F. at 407.

But the rationale of that case did not long survive. In The Ada, 250 F. 194 (2 Cir. 1918) Judge Ward repudiated it; Judge Hough dissented from the repudiation; and Judge Rogers withheld his view as unnecessary to the decision. Judge Ward adhered to his view in The Goyaz, 281 F. 259 (S.D.N.Y.1922), aff'd 3 F.2d 533 (2 Cir. 1924) and in Aktieselskabet Fido v. Lloyd Brasiliero, 233 F. 62 (2 Cir.), cert. denied 260 U.S. 737, 43 S.Ct. 97, 67 L.Ed. 489 (1922), Judge Rogers, who had refrained in The Ada from expressing an opinion, repudiated the rule of the Evans case.

The Seventh Amendment presents a serious obstacle to the transferance of the concept of ancillary jurisdiction as developed under the Federal Rules of Civil Procedure to the admiralty. Rule 38(b), Fed.R.Civ.P., authorizes any party, including an impleaded party, to make a demand for jury trial of any issue so triable. Bevemet Metais Ltd. v. Gallie Corp., 3 F.R.D. 352 (S.D.N.Y.1942); McAndrews v. United States Lines Co., 167 F.Supp. 41 (S.D.N.Y.1958). In Bevemet Metais, a fifth-party defendant-sixth-party plaintiff was entitled, upon timely demand, to a jury trial of the issues presented in both the fifth and sixth party complaints. However, in the admiralty, there has traditionally been no constitutional right to trial by jury. Waring v. Clarke, 5 How. 441, 460, 12 L.Ed. 226 (1847). Thus, if a party whose liability rests on common law principles is permitted to be impleaded in an admiralty suit without an independent basis of admiralty jurisdiction, the impleaded party

has effectively been denied the constitutional right to trial by jury. "Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." Dimick v. Schiedt, 293 U.S. 474, 486, 55 S. Ct. 296, 301, 79 L.Ed. 603 (1935), quoted with approval in Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 501, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959). See also Dairy Queen, Inc. v. Wood, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962); Simler v. Conner, 372 U.S. 221, 83 S.Ct. 609, 9 L.Ed.2d 691 (1963).[6] There is also a practical consideration. As Professor Moore argues, while the requirement of independent jurisdiction over third-party claims is unworkable on the civil side, it is entirely feasible in admiralty. 3 Moore, Federal Practice ¶ 14.25 (2 ed. 1948). Accordingly, the court lacks jurisdiction over Clark's impleading petition.

There remains the question of the direct claim of Crystal against Penson asserted in the amended libel. The gist of the cause of action asserted against Penson is that it "breached its * * * undertaking and agreement" with Crystal (Par. Twenty-Third, Amended Libel) and that Penson "in wrongfully delivering and making possible said wrongful delivery * * * constituted and amounted to * * * a conversion." (Par. Twenty-Fifth, Amended Libel) Viewing the libel with the liberality which must be accorded admiralty pleadings, Archawaki v. Hanioti, 350 U.S. 532, 76 S.Ct. 617, 100 L.Ed. 676 (1956); Dupont de Nemours & Co. v. Vance, 19 How. 162, 15 L.Ed. 584 (1856); D'Agosta v. Royal Netherlands S.S. Co., 301 F.2d 105 (2 Cir. 1962), the

6. For reasons that would take me too far afield to discuss, the doctrine of pendent jurisdiction is not here applicable, although applicable to admiralty causes of action brought on the law side of the federal courts when joined with a proper claim under the Jones Act, 41 Stat. 1007, 46 U.S.C. § 688. See Romero v. International Terminal Oper. Co., 358 U.S. 354, 380, 381, 79 S.Ct. 468, 3 L.Ed. 2d 368 (1959); cf. Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933).

amended libel asserts against Penson a breach of its customs brokerage contract with libellant and a tortious conversion.

Jurisdiction of the libel itself and that of the direct claims is premised on the admiralty and maritime jurisdiction of the court, 28 U.S.C. § 1333.[7] In determining whether there is jurisdiction over Crystal's claims against Penson, the inquiries are respectively whether the contract whose breach is alleged is a maritime contract or whether the tort alleged is a maritime tort.[8]

The standards for determining maritime contracts over which the admiralty has jurisdiction are hoary indeed. In New Jersey Steam Navigation Co. v. Merchants' Bank, 6 How. 344, 392, 12 L.Ed. 465 (1848), the court stated in determining admiralty jurisdiction over contracts the inquiry is "into the nature and subject matter of the contract,— whether it was a maritime contract, and the service a maritime service, to be performed upon the sea, or upon waters within the ebb and flow of the tide. And, again, whether the service was to be substantially performed upon the sea, or tide waters, although it had commenced and had terminated beyond the reach of the tide; if it was, then jurisdiction has always been maintained." "[I]t is settled that the contract articulated in a libel must be, directly and in essence, an obligation maritime in its nature, for the performance of maritime service or transactions, to confer jurisdiction." Pacific Surety Co. v. Leatham & Smith Towing Co., 151 F. 440, 443 (7 Cir. 1907). In sum, "[a]dmiralty jurisdiction over contracts is dependent upon the subject matter of the contract." Weinstein v. Eastern Airlines, Inc., 316 F.2d 758, 766 (3 Cir. 1963), petition for cert. filed, 32 U.S.L.Week 3047 (U.S. July 16, 1963) (No. 276). See generally, 1 Benedict, Admiralty § 62, at 127 (6 Ed. 1940).

The court has found no direct precedent holding a customs brokerage contract either within or without the jurisdiction of the admiralty. While admiralty jurisdiction over contracts "will always be a little vague at the borderline, no matter how long the process of judicial inclusion and exclusion goes on,"[9] the periphery of the problem has not gone untouched and by analogy the contours of the jurisdiction would seem to exclude the customs brokerage contract. The following contracts have been held to be not within the admiralty jurisdiction: A contract to procure insurance on a vessel, Warner v. The Bear, 126 F. Supp. 529 (D.Alaska 1955); a suit by a ship's agent seeking reimbursement of expenses, Cory Bros. & Co. v. United States, 51 F.2d 1010 (2 Cir. 1931); a contract to act as freight and passenger agents, The City of Clarksville, 94 F. 201 (D.Ind.1899), The Humboldt, 86 F. 351 (D.Wash.1898); a contract for storage of cargo after discharge from the vessel, Gowanus Storage Co. v. United States Shipping Board, 271 F. 528 (E. D.N.Y.1921).

Certainly the customs broker is employed to perform services which are to some degree connected with ocean carriage. But the contract itself contemplates the performance of services after the cargo has completed its ocean voyage.

7. Were there another basis of federal jurisdiction it would be unnecessary to decide this question. Cory Bros. & Co. v. United States, 51 F.2d 1010 (2 Cir. 1931). Crystal's claims against Penson cannot be premised on diversity of citizenship, 28 U.S.C. § 1332. Crystal is a New York corporation. As stated at page 289, supra, Penson is a copartnership, but there is nothing in the record to indicate the citizenship of the partners.

8. Crystal could not seek to assert the doctrine of ancillary jurisdiction in support of its claim against Penson, since, even assuming the doctrine's applicability in admiralty, it has been held not applicable to direct claims by plaintiffs against impleaded third-parties. See, e.g., Welder v. Washington Temperance Ass'n., 16 F.R.D. 18 (D.Minn.1954); 3 Moore, Federal Practice ¶ 14.27[1] (2 ed. 1948); Note, 58 Colum.L.Rev. 532, 542–43 (1958).

9. Gilmore & Black, The Law of Admiralty 19 (1957).

294

"The distinction between preliminary services leading to a maritime contract and such contracts themselves has been affirmed in this country from the first, and not yet departed from. It furnishes a distinction capable of somewhat easy application. If it be broken down, I do not perceive any other dividing line for excluding from the admiralty many other sorts of claims which have a reference, more or less near or remote, to navigation and commerce. If the broker of a charter-party be admitted, the insurance broker must follow,—the drayman, the expressman, and all others who perform services having reference to a voyage either in contemplation or executed." The Thames, 10 F. 848 (S.D.N.Y.1881).

■ When placed against this background, the customs brokerage contract, as the shipbuilding contract, is a contract "made on land, to be performed on land," [10] and, accordingly, its breach does not form a basis for admiralty jurisdiction.

■ The tort of conversion alleged by Crystal against Penson is likewise not within admiralty's jurisdiction. The critical factor in determining whether a tort claim comes within the statutory grant of admiralty jurisdiction is the situs of the tort, i. e., the place where it happened. Whatever acts of Penson constituted "wrongful delivery, and making possible said wrongful delivery * * *" (Par. Twenty-Fifth, Amended Libel) unquestionably occurred in the offices of Penson & Co., 11 Broadway. As has already been seen, even if the acts had their impact on the pier, this still would be insufficient.

Crystal's contention that admiralty jurisdiction over Penson can be founded on Penson's being the consignee has already been effectively disposed of in connection with the identical contention of Clark. Similarly, as has already been shown, Penson was improperly impleaded and Crystal cannot premise jurisdiction on the fact that as an impleaded party the libellant could have a decree under Admiralty Rule 56 directly against Penson. Accordingly, this court lacks jurisdiction over the direct claims of Crystal against Penson.

What results is unquestionably somewhat truncated. Yet, "[h]owever desirable it may be that controversies involving a group of litigants, the termination of which rest upon the substantially same operative facts, be disposed of in a single litigation, this Court may not assume jurisdiction unless it exists— it is 'without the judicial power to entertain a cause of action not within its jurisdiction, * * *.'" Maher v. Newtown Creek Towing Co., 190 F.Supp. 933, 934–35 (S.D.N.Y.1961).

## CONCLUSIONS OF LAW

1. The court has jurisdiction over the libellant, the respondent-petitioner Cunard and respondent-impleaded petitioner Clark.

2. Libellant Crystal is entitled to an interlocutory decree sustaining its claim for liability against the respondent-petitioner Cunard.

3. The respondent-petitioner Cunard is entitled in said interlocutory decree to a provision sustaining its claim of indemnity against the respondent-impleaded petitioner Clark.

4. The respondent-petitioner's liability is not limited by anything contained in either the bill of lading or the Carriage of Goods by Sea Act.

5. The libellant and the respondent-petitioner Cunard are entitled to a provision in the interlocutory decree for the reference to a Commissioner of the damages to which they are entitled with costs and interest, if any, as determined by this court, upon entry of the final decree herein.

6. The amended libel by Crystal is dismissed as to the respondent-impleaded Penson for lack of jurisdiction but without costs.

10. People's Ferry Co. of Boston v. Beers, 20 How. 393, 402, 15 L.Ed. 961 (1958).

7. The impleading petition against Penson by respondent-impleaded petitioner Clark is dismissed for lack of jurisdiction with costs.

Submit interlocutory decree on notice in accordance herewith.